**ASTRA–SJUCO, A. B., Medline Industries, and Caring International Division of Medline Industries, Appellants,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION and Steridyne Corporation, Appellees.**

**Appeal No. 80–3.**

United States Court of Customs and Patent Appeals.

Aug. 28, 1980.

Andrew P. Vance, Barnes, Richardson & Colburn, New York City, for appellants.

Dana M. Raymond, Allan H. Bonnell and James J. Maune, Brumbaugh, Graves, Donohue & Raymond, New York City, for Astra–Sjuco AB.

Gary L. Fairchild, Winston & Straw, Chicago, Ill., for Medline Industries.

Russell N. Shewmaker, Gen. Counsel, Claud L. Gingrich, Deputy Gen. Counsel, Theodore W. Kassinger, N. Tim Yaworski, Washington, D.C., of counsel, for International Trade Commission.

Richard L. Aitken, Lane, Aitken & Ziems, Washington, D.C., for Steridyne Corp.

Before MARKEY, Chief Judge, RICH, BALDWIN and MILLER, Judges, and RE, Chief Judge.[*]

BALDWIN, Judge.

This is an appeal from the July 25, 1979, order of the International Trade Commission (Commission) pertaining to investigation No. 337–TA–56, *In the Matter of Certain Thermometer Sheath Packages*. The Commission with one member dissenting, determined that there was a violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337,[1] by the importation into, and sale in, the United States of certain thermometer sheath packages found by the Commission to infringe certain claims of valid U.S. patents, and ordered that the subject packages be excluded from entry into the United States for the terms of the patents except where such importation is licensed by the patent owner. We affirm.

### Background

A complaint was filed with the Commission on June 7, 1978, on behalf of Steridyne Corporation (Steridyne), alleging that Astra–Sjuco A.B. (Astra–Sjuco), Medline Industries (Medline), and Caring International Division of Medline (Caring) were violating section 337 by the unauthorized importation and sale of certain thermometer sheath packages alleged to infringe certain claims of U.S. Patent Nos. 3,552,558 ('558) and 3,847,280 ('280), both issued to George W. Poncy (hereinafter the Poncy patents).

Steridyne is the exclusive licensee under the Poncy patents and manufactures and sells in the United States thermometer sheath packages covered by said patents.

Astra–Sjuco is a Swedish company which supplies the imported sheath packages, marketed under the TempoTek trademark, which it buys under a long–term contract with a Swedish manufacturer, Develo A.B. (not a party to this action). Medline is the

---

[*] The Honorable Edward D. Re, United States Customs Court, sitting by designation.

1. 19 U.S.C. § 1337(a) provides:
   (a) *Unfair methods of competition declared unlawful.*
   Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided.

importer of the TempoTek sheath packages and distributes them under its own name and through its Caring division. The TempoTek sheath is made in accordance with U.S. Patent No. 4,051,950 ('950), issued to Harry Jarund, a principal in Devello A.B.

The majority of the Commission determined that the TempoTek sheath falls within claims 1, 4, 5, 8, 9, 13, 15, 16, 17 and 18 of the '558 patent and claims 1, 2 and 5 of the '280 patent. The Commission treated the claims of the '280 patent as though they stand or fall with independent claims 1 and 13 of the '558 patent. Appellants' discussion in its brief also focuses on these claims, which read as follows:

1. A flexible sheath package for clinical tools and instruments comprising:

a. a sheath body of heat sealable material having an open end for the insertion of an instrument;

1. said sheath having a sterilizable exterior surface;

b. a separable, disposable outer cover for said sheath comprising heat sealable material wholly enclosing the outer surfaces of the sheath and sealed thereto on each side at the area of said sheath opening;

1. said cover having a sterilizable interior surface;

c. said sheath being defined by a seal line in the form of a tear seal, said tear seal joining said sheath and said cover together along the line of said seal, thereby enclosing said sheath body within the interior body of said cover; and

d. said outer cover and the waste portions of said sheath material outside of said seal line being separable from said sheath along said tear seal to expose said sheath for clinical use when said instrument is inserted therein.

13. Means for sheathing instruments against transmission of infectious diseases comprising an assembly having:

a. upper and lower layers of material with heat sealable, sterilizable facing surfaces;

b. intermediate layers of heat sealable, sterilizable material disposed between said upper and lower layers;

1. each of said intermediate layers being in contact with the respective adjacent heat sealable facing surface and with each other;

2. each of said intermediate layers being sealed along a marginal portion to its adjacent outer layer;

c. all of said layers being united by a seal defining the outline of the sheath, whereby a sheath is formed by said intermediate layers within the line defining said seal, said line forming a tear seal in said intermediate layers, said sheath having an open end and a closed end;

d. said upper and lower layers being strippable from said sheath and from each other substantially along said tear seal to expose said sheath for clinical use when an instrument is inserted therein.

Claims 1 and 5 of the '280 patent read:

1. A sheath package for surgical instruments and the like comprising superimposed laminations of material formed into two separate layers, the inner layer of each lamination forming a sheath for the reception of an instrument, said sheath having an open end and a closed end, the outer portions of each lamination comprising a cover for said sheath, said laminations being joined together by a seal defining said sheath, said seal between said laminations being constructed so that said outer portions are strippable from said sheath along said seal upon the insertion of an instrument into said sheath.

5. A flexible sheath package comprising two flexible layers sealed together along a seal line to define a sheath, a cover enclosing the outer surfaces of said layers within said seal line, the seal between said inner layers being constructed and said cover being fixed to said layers in a manner so that the outer portions of said flexible layers outside of said seal line is torn away from said sheath when said outer layer is peeled from said sheath with an instrument within said sheath.

Poncy sheath package as
illustrated in the '558 patent

TempoTek sheath package as
illustrated in Steridyne's Exhibit CS-9

As shown in figures 1 and 2 of the Poncy '558 patent reproduced above, the Poncy sheath package comprises two inner strips 12 and 14 of thin, flexible material and two outer strips 10 and 11 sandwiching said inner strips between said outer strips. The inner strips are joined together by a tear seal along the seal line 16, thus providing a thermometer sheath formed between the two inner strips. The outer cover strips 10 and 11 are releasably sealed to the inner strips along the tear seal line 16. The interior of the sheath 20 is open to the exterior of the package through the mouth of the sheath so that a thermometer can be readily inserted into the sheath while the sheath is still in the package.

To use the sheath, a thermometer is inserted therein while the sheath is still in the package and the cover strips are then pulled off, leaving the thermometer sheath 20 on the thermometer. The waste material of the inner strips 12 and 14 outside the tear seal line 16 is left attached to the sheath in the sheath package until the cover strips are pulled off, at which time this waste material is automatically torn away from the sheath. The nature of the tear seal formed between the inner two strips is that it is weakened along the center of the seal line 16 so that when the waste material of the inner two strips 12 and 14 is torn away, the tear seal tears down the middle of the tear seal leaving the waste portion of the inner two strips 12 and 14 still joined together along the outer half of the tear seal with the inner half of the tear seal also still joined together to form the sheath 20.

The imported TempoTek sheath package, as shown in figures 1 and 2 of Steridyne's Exhibit CS–9, reproduced above, comprises two inner strips 50 and 51 of thin plastic material which are joined together by a tear seal 58 to form a thermometer sheath in the two inner strips. The two inner strips 50 and 51 are sandwiched between paper cover strips 53 and 54 and are releasably sealed to the paper cover strips along the seal line 58. A green plastic end cover strip 56 is sealed to the upper strip 51 in the area of the mouth of the sheath and overlaps the paper cover strip 53. A white plastic end cover strip 57 is sealed to the lower inner strip 50 along the seal 61 and overlaps the paper cover strip 54. To use the TempoTek sheath package, a thermometer is inserted between the plastic strips 56 and 57 into the sheath defined by the tear seal line 58 in the inner strips 50 and 51. The cover strips are then pulled off causing the waste material of the inner strips 50 and 51 outside the seal line 58 to be torn away from the thermometer sheath with the cover strips and leaving the thermometer sheath on the thermometer.

An evidentiary hearing was conducted by a Commission Administrative Law Judge (ALJ), who recommended that the Commission determine that there was no violation of section 337 in the importation and sale in the United States of the TempoTek sheath packages. This recommendation resulted from his conclusion that the subject claims were invalid as obvious under 35 U.S.C. § 103 in view of prior art, or, if valid, the subject claims were not infringed. The ALJ also concluded that the importation

and sale of the TempoTek sheath had the effect or tendency to injure substantially the domestic industry.

The Commission, with one member dissenting, ordered the exclusion from entry into the United States of the TempoTek sheaths for the terms of the Poncy patents except where properly licensed. The majority determined that there was a violation of section 337 in the importation and sale of the TempoTek sheath packages, based on its conclusions of validity and infringement of the subject claims of the Poncy patents and its conclusion of substantial injury.

### Issues

The issues are (1) whether the TempoTek sheath infringes claims of the Poncy patents, (2) if infringed, whether the infringed claims are valid in view of prior art, and (3) whether the sale of TempoTek sheaths has resulted in substantial injury to the domestic industry.

### OPINION

■ Patent claims are to be construed in the light of the specification and the prosecution history. *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966). The determination of patent infringement is a two–step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Second, the claims must be read on the accused structures. *Autogiro Company of America v. United States*, 384 F.2d 391, 401, 181 Ct.Cl. 55, 155 USPQ 697, 705 (1967).

The claims in issue, read together with the drawings (see Figs. 1 and 2 of the '558 patent and ensuing discussion supra) and the specification, encompass a laminated structure yielding a thermometer sheath package. The '558 specification notes certain objectives of the claimed structure:

A principle object of the invention, therefore, is to provide, in a sterile, expendable package, a sterile, disposable sheath for such objects as clinical thermometers. Another object is to provide such a package into which a thermometer can readily be inserted by anyone, just prior to use thereof, so that the thermometer enters directly into a transparent sheath which has previously been sterilized and maintained in a sterile condition within the package in those areas which come into contact with the body of a patient, and from which the package can be stripped to expose the sterile sheath, whereupon the sheathed thermometer may be inserted into a body cavity, and a reading subsequently taken therefrom through said sheath, which may then be discarded. * * *

Another object of the invention is to provide a transparent sheath for a thermometer in which the exterior of the sheath is sterilized and is maintained in a sterile condition by its enclosing package, which is also sterilized at those portions which come into contact with the sheath.

A further object is to provide such a device which is disposable and can be mass produced in very substantial quantities in a short space of time at such low cost that is [sic] will be competitive with prior devices and methods for using thermometers and other devices which must be kept sterile in use to prevent contamination of patients.

### Infringement

■ Appellants assert that the subject claims do not read upon the TempoTek package and that the Poncy patents are, therefore, not infringed. We disagree.

Appellants contend that claims 1 and 13 of the Poncy '558 patent are not infringed because the term "sterilizable" as used in these claims should be interpreted as meaning "capable of maintaining the sterility of the packaged sheath" and the TempoTek sheath package does not have this capability. As found by the Commission, that construction of "sterilizable" is a considerable distortion of the plain, commonly accepted meaning of the term, which is "capable of being sterilized." There is nothing in the Poncy specification or in its file history to indicate that "sterlized" means anything other than "capable of being sterilized," a

definition fully applicable to the TempoTek sheath package.

Appellants contend that infringement of claims 1 and 13 of the '558 patent is avoided in the TempoTek package because the facing surfaces of the TempoTek package are not heat sealable. Claim 1 calls for the outer cover to comprise heat sealable material and claim 13 calls for the upper and lower layers, which comprise the cover, to have heat sealable facing surfaces. Appellants assert that the paper used as a cover for the TempoTek package is a thin, relatively porous paper which does not have a heat–sealable or thermoplastic coating thereon.

However, visual inspection of appellants' TempoTek sheath package shows that its cover is sealed to the plastic inner strips along the seal line in the same manner as the cover of the Poncy sheath package. Moreover, the ALJ found, and appellants' own witness admitted, that the cover strips of the TempoTek sheath package are sealed to the inner strips along the seal line. Further, disclosure in the '950 patent covering the TempoTek sheath package states that the cover strips "are removably heat sealed." Because the sealing features of the two embodiments are identical, it is clear that they are both heat sealable within the meaning of claims 1 and 13. Appellants further contend that the test for "heat sealable" is whether or not the material can be heat sealed to itself. However, there is no basis for such a limited meaning of "heat sealable" in the specification of the Poncy patent or in its file history.

Appellants contend that claims 1 and 13 of the '558 patent are avoided because they recite seals which completely enclose the sheath. Claims 1 and 13 have different recitations in this respect. Claim 1 recites a cover which wholly encloses the outer surface of the sheath. The TempoTek sheath is not ensealed in the sheath package, since there is no seal between the green plastic strip 56 and the upper cover strip 53 where they overlap, or between the white end plastic cover strip 57 and the lower paper strip 54, where these two strips overlap (see

figures 1 and 2, TempoTek sheath package supra). Nevertheless, the TempoTek sheath is wholly enclosed by the package cover since the plastic strips 56 and 57 are contiguous with the paper cover strips 53 and 54 where they overlap, respectively. While ensealing the sheath is important from the standpoint of guaranteeing sterility of the sheath when it is provided to the user, wholly enclosing the sheath is important to the Poncy sheath package to prevent the sheath from becoming contaminated by handling of the sheath package, as stated in the specification. The TempoTek sheath, while not ensealed, is wholly enclosed for this identical reason.

Claim 13, rather than reciting a seal which completely encloses the sheath, recites that each of the intermediate layers is sealed along a marginal portion to its adjacent outer layer. In the Poncy sheath, this recitation may be construed to refer to the seal between the intermediate layers at the mouth C and C', as shown in Figure 2 of the '588 patent (reproduced supra), or in the case of the lower intermediate layer, it may be the seal C' in the area B of the sheath. The seal C' in the area B ensures that when the cover strips are pulled off, the waste portion of the inner two strips is pulled away with the cover strips. In the TempoTek sheath, as shown in Exhibit CS–9 (reproduced supra), the cover strips, in addition to being sealed along their marginal portions at 60 and 61 to the inner strips are also sealed along the marginal portion 59 to the cover strips. The seal between the inner strips or intermediate layers 53 and 54 and the adjacent outer layers at 59 helps ensure that the waste material of the inner strips is torn away from the sheath when the cover strips are pulled off as in the case of the seal C' in the area B of the Poncy sheath. Thus, it is clear that the TempoTek sheath package has each of the intermediate layers sealed along a marginal portion to its adjacent outer layer as required in claim 13.

Appellants contend that claims 1 and 13 of the '558 patent and claims 1 and 5 of the '280 patent are not infringed because

these claims require a construction whereby the covers can be separately peeled back from the sheath like a banana. However, as found by the ALJ and the Commission, both the Poncy sheath package and the TempoTek sheath package can be opened either by the method of peeling the strips off one at a time, as recommended for the Poncy sheath package, or by pulling them off simultaneously, as recommended by appellants to the users of their package. As held by the Commission, "strippable" and "peeled," as used in the claims, include any form of wresting away, whether or not the covers are peeled back like a banana or pulled off simultaneously.

Appellants further contend that the TempoTek sheath does not infringe the claims of the Poncy patents because the TempoTek sheath package does not employ the feature of the Poncy sheath package in which the waste material of the inner strips functions as part of the package cover which closes the side edges of the sheath. In the Poncy sheath package, by having the sheath defined by a tear seal in two inner strips of the package, and by having the cover joined to the inner strips along the tear seal, a sheath package is provided in which the sheath can be formed and enclosed in a package in one stroke of a single die surface with the waste portions of the inner strips enclosing the side edges of the sheath. This structure is defined in claim 1, paragraph (c) and claim 13, paragraph (c) of the Poncy '558 patent. The TempoTek sheath employs this feature in the same manner in which it is employed in the Poncy sheath. The ALJ expressly found that there is a tear seal formed between the inner two strips of the TempoTek sheath, and this finding was expressly adopted by the Commission.

Accordingly, we agree with the determination of the Commission that the TempoTek sheath infringes certain claims of the Poncy patents.

*Validity of the Poncy patents*

The '558 and '280 patents are presumptively valid.[2] This presumption can be overcome only by clear and convincing evidence, with the burden of persuasion remaining upon the party asserting invalidity. *Stevenson v. International Trade Commission*, 612 F.2d 546, 550, 204 USPQ 276, 280 (CCPA 1979).

Appellants assert that the Poncy patents are invalid under 35 U.S.C. § 103 because the differences between the hermetically–sealed sheath package disclosed therein and the prior art are such that the patented sheath package as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966).

The ALJ found U. S. Patent No. 3,308,940 to Morris (Morris patent) to be the closest prior art reference. The Morris patent discloses a sheath enclosed in a package with the mouth of the sheath open to the exterior of the package to receive a thermometer while the sheath is still in the package just as in the sheath package of the Poncy inventions. The ALJ relied upon U. S. Patent No. 2,998,880 to Ladd (Ladd patent), U. S. Patent No. 3,235,063 to Jarund (Jarund '063 patent), and U. S. Patent No. 2,760,630 to Lakso (Lakso patent), for a disclosure of separately strippable or peelable cover strips with simultaneous removal of waste material outside of the tear seal line.

Appellants do not rely on the Ladd and Lakso patents, but assert that the only difference between the Poncy sheath package and the prior art is that it combines the feature of hermetically sealing the outer sheath surfaces, as disclosed by the Morris patent, with the feature of attaching the

2. 35 U.S.C. § 282 provides in part:
   A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

covers to the sheath around its perimeter, as disclosed by the Jarund '063 patent, for a cover on one side of the sheath and as illustrated in the Italian patent,[3] for two facing covers to enclose both the top and bottom sheath surfaces.

Appellants' argument that the concept of automatic waste removal with the cover strips is foreshadowed by the Jarund '063 patent and the Italian patent has no basis. In the Jarund patent, the removal of the waste material during the manufacturing process is specifically taught. Appellants provide no explanation how a person of ordinary skill in the art looking at the Jarund patent would have conceived of a sheath package in which waste material is left around the sheath in such a manner that it would be automatically removed when the cover strips are pulled off after a thermometer has been inserted into the sheath. Appellants' reliance on the Italian patent is similarly misplaced. The Italian patent has nothing to do with packaging the gloves that are disclosed therein and, accordingly, the concept of automatic removal of waste material with the cover strips after inserting an instrument in the packaged sheath is not suggested by the disclosure of the Italian patent.

The Commission found that even if, as appellants contend, retaining the waste material in the package were a matter of choice by the manufacturer, it is another matter to design a sheath package structure which incorporates the waste material and contributes to the purpose of the package while removing a manufacturing step which would otherwise increase the product's cost. The Commission further found that the concept of using the waste material as part of the package is not revealed directly by the prior art and is not obvious therefrom. As stated in the specification of the '558 patent, referring to the formation of the tear seal:

> The action of the die (not shown) has the effect of weakening a thermoplastic material along the center of the line 16 of the seal formed by the die so that the

plastic portions thereof outside the boundary of the sheath formed by the seal can be torn away, the remaining portions of the thermoplastic material adhering to the strip 11 along the edge of the line formed by the seal.

From this description, it is clear that the waste material functions to enclose the side edges of the sheath.

### Indicia of Nonobviousness

The ALJ found that there is considerable evidence of commercial success, unresolved needs, and failures of others met by the Poncy sheath package. More specifically, the ALJ found that the Poncy sheath package was the first sheath package to be successfully marketed in the United States and was sought by the buying public and competing or potential manufacturers. The Commission found this evidence demonstrated the unobviousness of the Poncy invention. Appellants contend that the Commission's reliance thereon is improper because there is no evidence in the record of any nexus between the evidence and the claimed invention. The record, however, contains credible uncontroverted evidence showing a nexus. The need for an inexpensive thermometer sheath package to solve the problem of patient infection by clinical thermometers was recognized as early as 1957 when the application for U. S. Patent No. 2,910,174 to Reid was filed in the Patent Office. The Reid patent was followed by numerous other proposals for thermometer sheath packages represented by U. S. Patent No. 2,915,175 to Diamant, U. S. Patent No. 2,969,141 to Katzin, U. S. Patent No. 3,092,252 to Brause et al., the Jarund '063 patent, U. S. Patent No. 3,221,555 to Biber, the Morris patent, U. S. Patent No. 3,215,265 to Welin–Berger, and U. S. Patent No. 3,416,651 to Jarund. These patents show a continuing effort by those working in the art to develop a reliable product to solve the problem of thermometer contamination. These prior proposals were not successful, as evidenced by the fact that it was the Poncy sheath package

**3.** Italian Patent No. 511535, granted January 26, 1955, to Soc.a. r.l. E.L.T.O. a Torino.

that was the first sheath package to be successfully marketed in the United States. Thus, a long–felt need for a commercially reliable sheath package existed at the time of the Poncy invention in 1968.

The Poncy sheath package, even though initially marketed by a small company in which the promotion and selling was done by Mr. Poncy himself, was commercially successful and was sought out by the general public, as established by the unsolicited letters in the record of individuals seeking to acquire the product. The fact that the prior sheath packages were not adopted, the fact that the Poncy sheath package had advantages over the prior art proposals which made it a practical product, both from the standpoint of the cost of manufacture and from the standpoint of reliability and simplicity establishes the nexus between the invention and its proven success.

Accordingly, we agree with the determination of the Commission that those claims found infringed are valid.

*Double Patenting*

■ Appellants maintain that the Poncy '280 patent is void for double patenting. This argument was presented to the ALJ who decided adversely to appellants in his recommended determination. Appellants did not file exceptions to this decision and neither briefed nor argued this issue before the Commission. The issue was not raised before the Commission. Accordingly, we do not reach it. *See Tong Seae Industrial Co. Ltd. v. International Trade Commission,* No. 79–38 (CCPA January 7, 1980).

*Injury*

■ Appellants assert that the evidence does not establish that the industry has been substantially injured by the importation of the TempoTek sheaths. However, the ALJ specifically found that appellants sell the accused packages in substantially the same units of packaging as Steridyne; appellants have sold the accused packages to customers of Steridyne; appellants have solicited accused package sales from Steridyne's customers, one of which purchased over one million of the accused products in 1978; Steridyne's profitability declined during the time period that the TempoTek sheath packages became established in the United States market; the ratio of appellants' sales to Steridyne's sales in appellants' first year of marketing achieved 40 percent; Steridyne's former western sales representative switched from the patented sheath packages to the accused goods resulting in lost sales; as a result of losing one of its customers to appellants, Steridyne no longer has the security of a long term arrangement with that customer under which it was to supply a large volume of sheaths; Steridyne's depressed market posture is exacerbated by the fact that once a customer switches to a new product, it is almost impossible to switch the customer back again; because of appellants' large capacity for producing and selling the accused sheath compared to Steridyne, with only 15 employees and a limited number of dealer distributors, appellants have the capacity to further decrease Steridyne's share of the market, if not destroy Steridyne's business. In the face of these findings of fact clearly supported by the record, appellants still maintain in their brief that there is no evidence that Steridyne has lost a single sale as a consequence of the accused importation. We are persuaded otherwise.

*Conclusion*

We hold that the TempoTek sheath infringes certain claims of the Poncy patent. Appellants have failed to carry their burden of persuasion in asserting the invalidity of those claims. The Commission's affirmative determination of injury to an industry is supported by substantial evidence in the record. Accordingly, the Commission's determination that there was a violation of section 337 in the importation into, and sale in, the United States of certain thermometer sheath packages found to infringe certain claims of valid U. S. patents is *affirmed.*