**SRI INTERNATIONAL, Plaintiff,**

v.

**MATSUSHITA ELECTRIC CORPORATION OF AMERICA, and Matsushita Electric Industrial Co., Ltd., Defendants.**

**No. C-82-3625-WWS.**

United States District Court,
N.D. California.

July 23, 1984.

Edward B. Gregg, Willis E. Higgins, Gregg, Caplan & Higgins, Geoffrey A. Steel, Menlo Park, Cal., for plaintiff.

Morton Amster, Michael G. Berger, Anthony F. Locicero, Amster, Rothstein & Engelberg, New York City, Jay M. Spears, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Plaintiff SRI International ("SRI") brings this action against defendants Matsushita Electric Co., Ltd., and its subsidiary, Matsushita Corporation of America, (collectively "MEI") for infringement of its U.S. Patent No. 3,379,633 ("the '633 patent"), originally issued to Albert Macovski in 1968, for a single tube color television camera.[1] Plaintiff claims that since 1978 MEI has been engaged in the manufacture and sale in the United States of single tube color television cameras which infringe Claims 1, 2, 7, 8, 9, and 10 of its '633 patent, and it seeks treble damages.[2] Defendants answer that the camera they sell does not infringe the asserted claims and that the '633 patent is invalid under 35 U.S.C. § 103 because its allegedly novel feature would have been obvious at the time of issuance to those of ordinary skill in the art. At the pre-trial conference held before the Court on April 13, 1984, defendants moved for summary judgment, claiming that plaintiff's submissions failed to raise a genuine issue of material fact as to infringement or obviousness. Having considered both parties' memoranda with regard to the summary judgment motion as well as the evidence the parties proposed to introduce at trial, the Court concludes that as a matter of law the accused device does not infringe the '633 patent and that defendants are entitled to summary judgment.

## FACTS

The '633 patent describes a method by which single tube color television cameras can perceive and transmit color images. Although the detailed technology of the patented and accused devices is complex, the gist of the '633 patent and its only teaching at issue in this action is the way in which a special light filter employs geometric principles to register the color of an object being televised. To understand how the filter facilitates color transmission, however, it is helpful to briefly note the functioning of the camera itself.

### 1. Background

Single tube television cameras operate by focusing the image to be televised onto a photosensitive image area in a part of the

---

1. The complaint also alleged infringement of SRI's U.S. Patent No. Re. 27,491, but that claim was dismissed with prejudice by Stipulated Order entered October 19, 1983.

2. The '633 patent expires in 1985, and plaintiff does not seek injunctive relief.

camera called a pick-up tube. The pick-up tube converts the image into a series of electrical signals by means of a sequence (or "raster") of horizontal lines across the image area. The amplitude of the electrical signals varies according to the intensity of light at any given point on the image area. These signals are then transmitted to a receiver and used to reproduce the original image on a television screen. When generated directly from the pick-up tube, the signals can record the intensity of the image but not its color.

An image in color is made up of various light components: a general brightness component called "luminance," and components of each of the three primary colors: red, blue, and green. To reproduce an image in color, the pick-up tube of a television camera must subdivide the image area into three primary color areas so that electrical signals corresponding to each of these colors can be generated simultaneously by a single raster scan of the pick-up image area.

Both systems at issue in this action accomplish color subdivision by placing a composite filter in front of the pick-up tube. The composite filter consists of two super-imposed filters each with a grid of different colored stripes. The stripes of one grid are yellow, a color that passes all light except blue (and is referred to as "subtractive blue"), and the other's stripes are cyan, a color that passes all light except red (and is referred to as "subtractive red"). As the scanning beam moves across the image over which the composite filter has been placed, the output signal generated includes two signal components representing the red and blue portions of the image. If the yellow stripes are of a different width than the cyan stripes, the beam of light moving at a constant speed will generate output signals of different frequency for the light (i.e. colors) passing the yellow stripes than for that passing the cyan stripes. These output signals, which are said to have "encoded" the color information from the image, are then "decoded" by a series of electrical filters and ultimate-

ly used to reproduce the image on a television screen.

## 2. *Prior Art: The Kell Patent*

The way in which striped filters "encode" color information is further explained by reference to U.S. Patent No. 2,733,291, issued in 1956 to Ray Kell for a color television camera ("the Kell Patent"), which both parties concede to be the most analogous prior art.

Kell teaches the use of a composite filter consisting of two grids of stripes, one colored cyan and the other yellow as shown in Figure # 1:

FIGURE 1:

The stripes on the two grids vary in width so that all the yellow stripes, of uniform width, are either wider or narrower than the cyan stripes, also of uniform width. As the scanning beam moves across the image area covered by the composite filter, the blue light component of the image is periodically interrupted when the beam passes over each yellow stripe. This periodic interruption generates an electrical signal representing the blue content of the image at a frequency corresponding to the frequency with which yellow (subtractive blue) appears in front of the image area. At the same time the filter generates a signal representing the red content of the image at a frequency corresponding to the frequency of cyan (subtractive red) stripes.

Under the Kell patent, because the cyan and yellow stripes vary in width, the frequency of the red and blue signals differ from each other and from the frequency of the luminance or general brightness component. Thus if the filter has more yellow stripes than cyan stripes, the frequency of the three light components can be diagrammed as appears in Figure # 2:

## FIGURE 2

where the horizontal axis represents frequency measured in megahertz (MHz) and the vertical axis represents amplitude or intensity of the light. Each color is said to have a "carrier frequency" at the central hump of its frequency range and "side bands" on either side of the carrier frequency. As can be seen, the luminance component has the lowest frequency range while the red and blue components have higher frequency ranges depending on the spacing of the subtractive color grids.

The output signals thus generated are then "decoded" by three electrical filters called "low pass" and "band pass" filters which are able to separate out luminance, red, and blue signals by virtue of the variations in their carrier frequencies. In a process not relevant to this action, the green color component is obtained by subtracting out the blue and red components from the luminance component. The separated signals are then funnelled out through different output channels and are ultimately recombined to reproduce the colored image by means of a second scanning beam projected on the television screen.

The Kell patent suggests a number of minor variations to this basic scheme, one of which is relevant to this action. Kell recognized that the superimposition of one vertical grid on another creates the possibility of "beats" or "moire" interference which takes the form of light and dark bands across the filter. The Kell patent teaches that moire interference can be reduced if the stripes are placed at an angle, rather than parallel, to one another. Fig-

ure 4D of the Kell patent shows striped grids so angled, and the specification explains that:

> the orientation of the different negative grids with respect to the scanning direction as shown in Figure 4D decreases any moire effects that might otherwise be produced.

### 3. *The '633 Patent*

Plaintiff's '633 patent teaches basically the same system as Kell except that the two grids have stripes of equal width. The grids are placed at an angle to one another, however, so that as the scanning beam moves horizontally across the filter, the frequency ranges of the red and blue components will still differ. As shown in Figure #3, the scanning beam moves across a yellow grid of 1 centimeter-wide stripes placed vertically on the pick-up tube.

## FIGURE 3

In Figure #4, it moves across a cyan grid of stripes also 1 centimeter wide but placed at a 45° angle to the vertical; the resulting distance traveled by the beam over each cyan stripe is, as a matter of pythagorean geometry, 1.4 centimeters.

## FIGURE 4

The frequency range generated by the second grid for the red signal component would thus be lower than the frequency range generated by the first grid for the blue signal component. The frequency diagram for the '633 patent is thus identical to that of the Kell system in Figure # 2, and the signals are decoded by low- and band-pass filters just as in Kell.

### 4. *The MEI System*

The MEI camera also employs a composite filter of angled cyan and yellow striped grids with equally spaced stripes to encode color signals off a single pick-up tube. The grids of the MEI filter, however, are placed at equal and opposite angles to the vertical. As a result, the distance travelled by the scanning beam over the stripes of both grids is the same and no variation in frequency range is created between the blue and red components. The appearance of the frequency diagram is shown in Figure # 5:

## FIGURE 5

Because the MEI filter does not generate the frequency range variation between red and blue signal components based on stripe widths that vary in relation to the scanning movement, as taught by the Kell and '633 patents, the camera cannot decode the color components by means of band-pass filters. Instead, it employs what is called a 1–H delay line comb filter which separates the red and blue components by means of a complicated series of manipulations as follows. As the scanning beam moves across the first scan line over the filtered image, it creates signals of alternating red and blue zones as shown in Figure # 6:

## FIGURE 6

These signals are said to be "out of phase" because the red and blue components alternate rather than overlap. As the beam moves across the next line, however, it creates a signal of zones containing neither color alternating with zones containing both colors. Here the red and blue components are "in phase" because they overlap rather than alternate. The 1–H delay line comb filter operates to delay the scan line signal just long enough for the filter to align it with the next scan line and then combine the two. Where the red signals in a given pair of aligned zones from two scan lines are in phase once the scan lines have been shifted and combined, and the blue signals are out of phase, the blue signals will cancel out and only the red will remain. Conversely, where the blue signals are in phase and the red out of phase, only the blue signal will remain. Thus the 1–H delay line comb filter uses the phase variation of the red and blue signals in alternating scan lines to separate out or decode the two colors. The luminance and green components are separated out in the same way as in the Kell and '633 patents, and the

various signals recombined to reproduce the full color image on a television screen.

## DISCUSSION

Defendants argue that the '633 patent teaches the use of a composite filter with two grids of equally spaced stripes superimposed at an angle in order to generate frequency range variations which permit color separation. The stripes of the MEI filter, in contrast, are set at equal and opposite angles to the vertical so that no frequency range variation can be generated between the two primary color signals; instead, phase separation techniques are used to separate the red and blue components from a single frequency range. Defendants claim that the '633 patent therefore does not cover the MEI system and that there is no infringement.

Plaintiff responds that its '633 patent teaches a filter with two grids of equally spaced stripes superimposed at an angle and a television camera that employs such a filter. It contends that, so described, its patent covers the MEI system. Moreover, plaintiff argues that there are disputed issues of material fact as to whether the red and blue signal components of the MEI system have the same frequency, as defendants contend.

■ Interpretation of the claims of a patent is a question of law; whether the patent so defined reads on to the accused device is a question of fact, *SSIH Equipment S.A. v. United States Internat'l Trade Comm'n*, 718 F.2d 365, 376 (Fed.Cir. 1983); *Kalman v. Kimberly Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). When there is no dispute over the construction of the patented device and the accused device, the question of infringement becomes one of law, *CS & M, Inc. v. Covington Bros. Tech.*, 678 F.2d 118, 118 (9th Cir.1982); *Hansen v. Colliver*, 282 F.2d 66, 69 (9th Cir.1960).

Plaintiff here challenges nothing in defendants' detailed explanation of the operation of the '633 and MEI systems other than the use of the "phase separation" label by defendants to describe the MEI method of decoding color information and defendants' alleged assertion that the MEI system generates no frequency variations between the red and blue signals. Neither of these disputes, it will be shown, creates genuine issues as to the construction or operation of the two devices, and interpretation of the patent for purposes of determining infringement thus becomes a matter of law properly resolved on motion for summary judgment.

### 1. *Interpretation of the Patent*

■ In interpreting the scope of a patent, the Court looks first to the language of its claims which "initially provides the measure against which infringement is determined," *Sarkisian v. Winn-Proof Corp.*, 697 F.2d 1313, 1321 (9th Cir.), *cert. denied*, 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983). Claim 1 of the '633 patent, from which Claim 2 depends, teaches a spatial filter with a grid of parallel spaced lines of a subtractive primary color and

> a second grid *relatively angularly superimposed* over all of said first grid, said second grid having parallel spaced lines having the color of another subtractive primary, each grid having the same line density.

Col. 5, 11. 9–12 (emphasis added). Claim 7, from which claim 8 depends, describes a camera using a filter with a set of parallel spaced lines of one subtractive color and a second set of lines of another subtractive color "diagonally disposed relative to the lines of said first grid." Claim 9, from which Claim 10 depends, employs virtually identical language.[3]

Defendants argue that the terms "relatively angularly superimposed" and "diagonally disposed" require that the grids be placed at different angles from the vertical so as to generate frequency range differences for encoding the two subtractive colors. Plaintiff responds that the language

---

**3.** Claim 9 refers to "lines diagonally placed relative to said first grid lines."

should be read to cover filters with grids of equally spaced stripes crossed at any angle.

Read out of context, "relatively angularly superimposed" arguably might mean that the stripes need only be crossed at an angle to one another or that the angles formed by the stripes to the scanning line differ relative to one another. Similarly, "diagonally disposed" relative to the first grid's stripes could suggest that both sets of stripes run diagonally over the image area or that the first set be vertical and only the second diagonal to form a 45° angle between the two.

■ But patent claims must be construed in the light of specifications, *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966); *Astra Sjuco, A.B. v. United States Internat'l Trade Comm'n,* 629 F.2d 682, 686 (C.C.P.A.1980); a claim "must be interpreted by reference to the 'art or technology to which the claimed subject matter pertains' ... For that purpose, a court is not precluded from consulting the specifications," *N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 590 F.2d 415, 421 (2d Cir.1978).

The specifications of the '633 patent make clear that the claims allegedly infringed envision a filter with grids superimposed at different angles from the vertical to generate frequency variations for the two primary color signals. They explain that the grids' lines lie at "relative angles such that upon subsequent flying spot scanning of the recorded image made with this filter, an adequate separation is obtained between carrier side bands derived from such scanning," col. 2, 11. 56–63. The specifications explicitly state that "the separation between the sidebands of the blue and red spectrum signals [i.e. frequency differences] is determined by the angles made by the respective grids of the spatial filter," col. 3, 11. 60–63.

Moreover, the specifications assume one of the two grids to be oriented vertically with the other diagonally imposed on it to form a 45° angle: thus, red light will not

pass through the "vertical cyan lines" and blue light will not pass through the "diagonal yellow lines," col. 3, 11. 5–7. "The red information," the specifications go on to state, "is encoded in the vertical lines and the blue information is encoded in the diagonal lines," col. 3, 11. 29–31. Although the specific angle between the two grids of 45° is "by way of example" only, col. 2, 1. 65, the importance of frequency range separation is clear. Read alongside the specifications, then, the allegedly infringed claims plainly teach a filter which positions red and blue signals at different carrier frequencies so that they may be decoded by electrical band-pass filters.

■ This reading of the claims, furthermore, is confirmed by the history of the prosecution of the '633 patent before the Patent and Trademark Office, "which is always relevant to a proper interpretation of a claim," *SSIH, supra,* 718 F.2d at 377; *Astra-Sjuco, supra,* 629 F.2d at 686; *Autogiro Co. of America v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 395–99 (1967). In distinguishing the '633 patent from prior art and in particular from the Kell patent, which taught frequency variation generated by differing stripe width, SRI's attorney repeatedly explained to the Patent Office that

> this applicant insures two different modulating frequencies by virtue of placing one grid at an angle to another grid

(Exb. D–74). Having argued to the Patent Office a narrow construction of the claims which emphasized the generation of frequency variation by angle differentiation, SRI is "precluded from arguing a broader construction for purposes of infringement," *Coleco Industries, Inc. v. United States Internat'l Comm'n,* 573 F.2d 1247, 1257 (C.C.P.A.1978).

■ So interpreting the '633 patent precludes a finding that the allegedly infringed claims can be read onto the MEI filter. The grids on the MEI filter are placed at equal angles to the vertical so that the red and blue portions of the image do not create different carrier frequencies. Instead

a single carrier frequency is generated by both red and blue signals which are then decoded through the phase-separation technique of a 1–H delay line comb filter.

### 2. "Reverse Equivalents."

Finally, even if MEI's filter were found to fall within the literal language of the '633 claims, "the interpretation of patent claims calls for more than application of a rigid literalism," *Speed Shore Corp. v. Denda*, 605 F.2d 469, 472 (9th Cir.1979). Under the doctrine of "reverse equivalents," despite literal readability of the asserted claims on an accused device, "the structures must do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement," *Autogiro*, 384 F.2d at 401; there can, as a matter of law, be no infringement if "there is no infringement of the true spirit and scope of [plaintiff's] invention," *Kalman*, 713 F.2d at 771.

Here the MEI filter cannot be found to do the same work in the same way with the same result as the SRI filter. Although the MEI filter does employ grids with spaced stripes superimposed at an angle, those lines do not generate two carrier frequencies as a result of forming angles to the vertical; rather the angled superimposition serves to create phase differences which allow decoding by means of a delay-line filter while avoiding moire interference. When the true scope of the '633 claims is looked to rather than their bare language, the gist of plaintiff's patent is the creation of two carrier frequencies to encode color information; defendants' camera, as a matter of law, cannot be found to infringe.

### 3. Plaintiff's Objections.

In opposition to defendants' motion, plaintiff focuses on three pieces of evidence which it claims create triable issues of material fact on the question of infringement. The Court considers each of these in turn

in light of its interpretation of the scope of the '633 patent.

#### a. The Nakabe Paper

Plaintiff relies first on the translation of a 1979 magazine article written in Japanese by Ryuhei Nakabe, one of defendants' proposed expert witnesses, on the subject of "Single Tube Color Television Camera[s]." [4] There Nakabe describes both the '633 and the MEI cameras as "frequency separation systems" and refers to a third camera, concededly unlike either the '633 or MEI systems, as a "phase separation system." Plaintiff argues that these references undercut defendants' characterization throughout this litigation of the MEI camera as a "phase separation" system and cast doubt on the veracity of defendants' experts who assert that the MEI system does not depend on frequency variation to decode the primary colors.

Plaintiff's argument is wholly semantic and seeks to rely on labels which may have different meanings in different contexts rather than on the substantive manner in which the various systems operate. The irrelevance of terminology becomes evident upon consideration of the basis for the "frequency separation" label in the Nakabe paper.

Plaintiff cannot dispute that the MEI filter generates a single carrier frequency for the red and blue color components. It appears, however, that the red and blue components in the sidebands to the left and right of the carrier frequency hump shown in Figure # 5 concentrate at alternating frequencies as a result of the phase difference between successive scan lines. Thus, as shown in the Nakabe paper and in the Brandinger Patent, one of the patents licensed to MEI and relied on by plaintiff, the red and blue signals are interleaved within the frequency range centered about the common carrier frequency. See Figure # 7.

**4.** 25 Nat'l Tech.Rep. 172, 172–84 (February 1979).

FIGURE 7

This phenomenon is discussed in the Brandinger Patent at col. 9, 11. 64–68, col. 10, 11. 1–18:

> The curve 39 represents the spectrum occupied by both the blue and red representative carrier wave components. This spectrum extends from 3.7 MHz to 4.7 MHz, centered around 4.2 MHz. The dotted and solid lines contained within curve 39 represent the interleaved sideband components of the red and blue representative carrier wave components. The effect of the red and blue color carrier waves undergoing a 180° phase shift in relation to each other from one scanning line to the other results in the color carrier sidebands being effectively spaced from each other by one half of 15.734 KHz. Thus the separate red and blue color representative carrier waves and their associated sidebands are said to be interleaved. The comb filter apparatus ... operate (sic) to separate the interleaved red and blue color signals ... enabling a relatively wideband brightness signal providing good scene detail to be produced because *the two ... color carrier signals are interleaved in the same spectrum required to contain a single color signal in prior art arrangements.*

(Emphasis added). The above description and, in particular, the underscored passage make clear the significant difference between the MEI and '633 systems. It is wholly irrelevant to the question of infringement whether the MEI camera is characterized as a frequency separation system, as in the Nakabe paper, because red and blue signal components are interleaved within one frequency range, or as a phase separation system, as in defendants' motion papers, because the phase shifts in alternating scan lines are manipulated to decode the color signals. The use of one label rather than another does not detract from the functional distinction between defendants' one-carrier frequency system and plaintiff's two-carrier frequency system.

Significantly, in its status conference statement submitted to the Court at an early stage of the litigation, plaintiff explained that in the MEI camera

> the frequencies are the same and the colors cannot be distinguished on the basis of frequency differences.

This is precisely defendants' contention in making this motion. Plaintiff's counsel now contends that he did not fully understand the technology of the two systems when he submitted the statement. He also argues that although

> frequencies are the same in the MEI system on a given scan line, [they] differ on successive scan lines.

But the frequency difference to which this latter statement refers is the phase alternation between red and blue zones on successive scan lines; that phase alternation permits decoding without separate carrier frequencies and is not present in the '633 system. Despite the dispute over labels, therefore, plaintiff does not challenge defendants' description of the manner in which the two systems operate, and nothing in the Nakabe paper contradicts the conclusion that, as a matter of law, the MEI camera does not infringe the '633 patent.

b. *The Macovski Affidavit*

Plaintiff next points to an additional affidavit filed by Macovski, its expert witness and the inventor of the '633 system, claiming that both the '633 and the MEI filters create interleaved carrier frequencies. He points to the specifications of the '633 patent which states at col. 4, 11. 29–41:

> Overlap in the various spectra is tolerable because of the nature of their frequency distributions. Both the luminance and red signals have spectra which

are primarily multiples of the horizontal line frequency. The blue signal, however, which is the source of overlap into each of the other spectra, has primarily components which are odd multiples of one-half of the line frequency because of the diagonal lines. As such, components which appear in the wrong filter will tend to be invisible because of spatial interlace. That is, they will be of opposite polarity on alternate scanning lines and tend to average out to zero, similar to that of the present color television signals.

This language, plaintiff contends, "raises a further inference that there is no fundamental difference between the two systems."

It is clear, however, from the specification and from the accompanying diagrams that the '633 patent envisions the blue and red carrier frequencies as entirely discrete. Frequency cross-over when they are not discrete creates the danger that, for example, a red signal component falling within the blue frequency range will be incorrectly read by the system's band-pass filter as blue. The quoted language merely explains that some cross-over is "tolerable" because the alternating blue and red frequencies in the area of overlap will tend to cancel each other out. Thus, any overlapping that inevitably occurs should not tend to distort the image produced. But nothing in the '633 patent teaches a method for encoding or separating red and blue signals in one band about a single carrier frequency.

Macovski also points to language in the '633 specification that

[a]lthough the filtering shown is considered quite adequate, a further refinement to render undesired components invisible would be to move the entire raster one line on alternate frames. This would lose resolution, but would provide interlace in time.

Col. 4, 11. 41–45. The suggestion that the entire raster be moved one line on alternate frames is also aimed at cancelling crosstalk. The 1–H delay line comb filter employed by the MEI system for phase division does not entail alternating the entire raster and achieves an entirely different effect: that of color separation. Thus the Macovski affidavit and the specification language do not create triable issues as to whether the MEI system infringes the '633 patent but rather confirm that it does not.

### c. *The Pritchard Paper*

Finally, plaintiff quotes from the Pritchard Paper, a 1973 magazine article written by an expert in the area of television photography, which states:

the changes from the Kell/SRI system required in order to realize these performance gains are minimal. The same optical stripe-color filters are used; they are merely reoriented to be symmetrically disposed at the appropriate angle around the vertical scan axis. The same luminance channel circuits, amplitude detectors, and matrix functions are required. Only one band-pass filter is required in order to select the red and blue color information, while a 1–H delay line comb filter circuit is added to provide means for separating the red and blue information prior to envelope detection.

Even if this hearsay were admissible, which defendants dispute, the quoted language does nothing more than explain that the hardware changes necessary to convert the '633 system into the MEI camera are not substantial. The question before the Court is whether the accused device achieves the same result in the same way as the allegedly infringed device. It has been shown that the two systems operate in fundamentally different ways and that the '633 patent cannot be read, either literally or "in true spirit," on the MEI camera. The ease with which the one can be converted into the other does not detract from those differences; in fact, given the "performance gains" to which Pritchard alludes, the inference arises that the '633 patent would have described a system closer to MEI's unless some basic conceptual distinction existed between them.

474

For the reasons stated, the motion for summary judgment is granted and defendants are directed forthwith to submit a form of judgment.

IT IS SO ORDERED.