SSIH EQUIPMENT S.A., Appellant,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION and Stewart-Warner Corporation, Appellees.

Appeal No. 82–2.

United States Court of Appeals, Federal Circuit.

July 15, 1983.

Kevin E. Joyce and Jonathan S. Kahan, Washington, D.C., argued for appellant. With them on the brief were George M. Sirilla, Peter W. Gowdey and Mark A. Sterling, Washington, D.C., Gerard Mandelbaum and Sandor C. Schweiger, New York City, of counsel.

Joel Junker, Washington, D.C., argued for appellee. With him on the brief were Michael H. Stein, Gen. Counsel, Washington, D.C., and Catherine R. Field.

Melvin M. Goldenberg, Chicago, Ill., argued for intervenor. With him on the brief were Theodore R. Scott, Thomas C. Elliott, Jr. and Augustus G. Douvas, Chicago, Ill., of counsel.

Before RICH, DAVIS, KASHIWA, SMITH and NIES, Circuit Judges.

NIES, Circuit Judge.

SSIH Equipment S.A. (SSIH) appeals from the final determinations of the United States International Trade Commission (Commission) in Investigation No. 337–TA–75, Certain Large Video Matrix Display Systems and Components Thereof, under section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337 (1976 and Supp. IV. 1980)) (hereafter § 337), which prohibits

unfair methods of competition in the importation of articles into the United States.

The Commission determined that there was a violation of § 337 because SSIH had imported and installed a stadium scoreboard for the Milwaukee Brewers Baseball Club, Inc., which infringed certain United States patents owned by Stewart-Warner. USITC Pub. No. 1158, 213 USPQ 475 (1981). An exclusion order currently bars importation of scoreboards which infringe only one of these patents, U.S. Patent No. 3,594,762.

Our jurisdiction over this appeal is found in the Federal Courts Improvement Act of 1982. 28 U.S.C. § 1295(a)(6). We reverse in part, vacate the order, and remand.

I

The subject investigation was instituted on December 17, 1979, by the Commission on the basis of a complaint filed by Stewart-Warner Corporation (S–W). The complaint alleged that SSIH violated § 337 [1] by

---

1. 19 U.S.C. § 1337 (1976 and Supp. IV 1980) provides, in pertinent part:

 § 1337. *Unfair practices in import trade*
 (a) *Unfair methods of competition declared unlawful*
 Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provisions of law, as provided in this section.
 (b) *Investigation of violations by Commission; time limits*
 (1) The Commission shall investigate any alleged violation of this section on complaint under oath or upon its initiative.
 \* \* \* \* \* \*
 (2) During the course of each investigation under this section, the Commission shall consult with, and seek advice and information from, the Department of Health and Human Services, the Department of Justice, the Federal Trade Commission and such other departments and agencies as it considers appropriate.
 \* \* \* \* \* \*
 (c) *Determinations; review*

 The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section. Each determination under subsection (d) or (e) of this section shall be made on the record after notice and opportunity for hearing in conformity with the provisions of subchapter II of chapter 5 of title 5. All legal and equitable defenses may be presented in all cases. Any person adversely affected by a final determination of the Commission under subsection (d), (e), or (f) of this section may appeal such determination to the United States Court of Customs and Patent Appeals for review in accordance with chapter 7 of title 5. Notwithstanding the foregoing provisions of this subsection, Commission determinations under subsections (d), (e), and (f) of this section with respect to its findings on the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, the amount and nature of bond, or the appropriate remedy shall be reviewable in accordance with section 706 of title 5.
 (d) *Exclusion of articles from entry*
 If the Commission determines, as a result of an investigation under this section, that there is violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the effect of

virtue of infringement of certain claims in U.S. Patent Nos. 3,495,762; 3,941,926; and 4,009,335 ('762, '926, and '335 patents, respectively).[2] Specifically, S–W alleged that the following 25 claims were being infringed:

The '762 patent—Claims 10, 12

The '926 patent—Claims 1 through 5

The '335 patent—Claims 1 through 6, 10, 11, 16 through 21 and 27 through 30.

The Commission unanimously determined that there was a violation of § 337 in that

the above claims were valid and, as asserted, were infringed by SSIH's imported scoreboard. The Commission entered an exclusion order, in accordance with § 337(d),[3] on June 19, 1981, and forwarded it to the President, as required under § 337(g).[4] This order barred importation of products which infringed "one or more claims" of the three patents.

On July 16 and 17, 1981, the '926 and '335 patents were held invalid in an infringement action to which SSIH was not a party. *Stewart-Warner Corp. v. City of Pontiac,*

---

such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry. The Commission shall notify the Secretary of the Treasury of its action under this subsection directing such exclusion from entry, and upon receipt of such notice, the Secretary shall, through the proper officers refuse such entry.

(e) *Exclusion of articles from entry during investigation except under bond*

\* \* \* \* \* \*

(f) *Cease and desist orders; civil penalty for violation of orders*

\* \* \* \* \* \*

(g) *Referral to President*

(1) If the Commission determines that there is a violation of this section, or that, for purposes of subsection (e) of this section, there is reason to believe that there is such a violation, it shall—

(A) publish such determination in the Federal Register, and

(B) transmit to the President a copy of such determination and the action taken under subsection (d), (e), or (f) of this section, with respect thereto, together with the record upon which such determination is based.

(2) If, before the close of the 60-day period beginning on the day after the day on which he receives a copy of such determination, the President, for policy reasons, disapproves such determination and notifies the Commission of his disapproval, then, effective on the date of such notice, such determination and the action taken under subsection (d), (e), or (f) of this section with respect thereto shall have no force or effect.

(3) Subject to the provisions of paragraph (2), such determination shall, except for purposes of subsection (c) of this section, be effective upon publication thereof in the Federal Register, and the action taken under subsection (d), (e), or (f) of this section, with respect thereto shall be effective as provided in such subsections, except that articles di-

rected to be excluded from entry under subsection (d) of this section or subject to a cease and desist order under subsection (f) of this section shall be entitled to entry under bond determined by the Commission and prescribed by the Secretary until such determination becomes final.

(4) If the President does not disapprove such determination within such 60-day period, or if he notifies the Commission before the close of such period that he approves such determination, then, for purposes of paragraph (3) and subsection (c) of this section such determination shall become final on the day after the close of such period or the day on which the President notifies the Commission of his approval, as the case may be.

(h) *Period of effectiveness*

Except as provided in subsections (f) and (g) of this section, any exclusion from entry or order under this section shall continue in effect until the Commission finds, and in the case of exclusion from entry notifies the Secretary of the Treasury, that the conditions which led to such exclusion from entry or order no longer exist.

\* \* \* \* \* \*

19 U.S.C. § 1337 (Supp. V 1981) made no changes from the above.

This court was substituted for the Court of Customs and Patent Appeals in § 337(c) by virtue of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 163(a), 96 Stat. 25, 49 (1982).

**2.** The '762 patent issued July 20, 1971, on an application filed March 27, 1967. The '335 patent issued February 22, 1977, on an application filed August 6, 1973. The '926 patent issued March 2, 1976, on an application filed April 8, 1974. A fourth patent (No. 4,148,073) was alleged, but was later withdrawn on S–W's motion.

**3.** See n. 1, supra.

**4.** See n. 1, supra.

213 USPQ 453 (E.D.Mich.1981).[5] That decision is currently on appeal to the Sixth Circuit.

On August 10, 1981, while the exclusion order was before the President, the Commission was made aware of the district court decision and modified its exclusion order to suspend "that portion of the order referring to the '926 and '335 patents, pending resolution of the [question of their] validity . . . on appeal." 44 Fed.Reg. 42217 (1981).

The General Counsel of the United States Trade Representative notified the Commission on August 19, 1981, of the President's decision on the exclusion order as modified, stating that:

> We have received notice that the President has decided to take no action regarding the Commission's determination in Investigation No. 337–TA–75, *Certain, Large Video Matrix Display Systems and Components Thereof.*
>
> \* \* \* \* \* \*
>
> The sixty day period provided for Presidential review of the Commission determination was not extended since the amendment made by the Commission did not alter the nature of the determination or the order materially. The exclusion order issued by the Commission following that investigation, therefore becomes final automatically on August 19, 1981.

SSIH filed a notice of appeal from both the order of June 19, 1981, and the order of August 10, 1981.[6] SSIH asserts, however, that only the order as modified is reviewable, and that the issues on appeal are limited to the findings related to the modified order. SSIH urges that the Commission erred in holding that the '762 patent was valid and enforceable and was infringed by the SSIH imported scoreboard. It further argues that it has not caused any injury to

S–W and that the public interest factors statutorily required for a determination of a remedy under § 337(d) preclude issuance of the order.

S–W argues that the original June 19, 1981 order is the only final appealable order and asks that we affirm the conclusions of validity, infringement, and enforceability of all three patents and all other conclusions supporting that order.

The Government endorses the position of SSIH that only the order as modified is reviewable, but opposes SSIH on all other issues with respect to the correctness of the exclusion order based on the '762 patent.

SSIH and the Government both maintain that the '926 and '335 patents remain in the case only for the purpose of evaluating whether S–W was guilty of inequitable conduct.

## II

The initial question is what issues are properly before us. S–W urges that the order of June 19, 1981, is the only exclusion order sent to the President and that after 60 days, since the president did not disapprove it, all of the findings and conclusions underlying that order became final for purposes of appeal by SSIH. In S–W's view, the order of August 10, 1981, did not affect the finality of the June 19, 1981 order; rather the later order merely stayed the date when the first will become operative.

SSIH and the Government argue that the August 10, 1981 order in part nullified the order of June 19, 1981, and only the findings and conclusions which support the more limited exclusion order are subject to review by this court at this time. We agree.

In reaching our conclusion, we have first considered the authority of the Commission

---

5. The '762 patent was not in issue in the *Pontiac* case. S–W's counsel conceded during oral argument of the instant appeal that the scoreboard constructed by American Sign & Indicator Co., which was claimed to infringe the claims of the '926 and '335 patents in the *Pontiac* case, did not embody the invention claimed in the '762 patent.

6. SSIH filed a separate appeal from the denial of a motion to reopen proceedings to consider newly discovered evidence. *See SSIH Equip. S.A. v. USITC,* 673 F.2d 1387, 213 USPQ 529 (CCPA 1982) (Petition for writ of mandamus denied). SSIH subsequently amended its notice of appeal to include the denial of that motion in this appeal. In view of our disposition of this appeal, the denial of that motion need not be considered.

to modify an exclusion order before Presidential action during the 60 day period provided for such review.

Under the statute, § 337(h),[7] the Commission is specifically authorized to terminate the effectiveness of an exclusion order when the Commission finds that the conditions which led to exclusion no longer exist. S–W argues that this provision does not apply here because the order of June 19, 1981, was not "effective" until after the Presidential review period expired. S–W confuses the "effectiveness" of a determination with its "finality." While Commission determinations are not *final* for purposes of appeal to this court until the review period has run, they are otherwise "effective upon publication . . . in the Federal Register." Section 337(g)(2). During the Presidential review period, products are in fact excluded from entry except under bond. Hence, on June 24, 1981, when the Commission's order was published in the Federal Register (46 Fed.Reg. 32694), the power to terminate arose under § 337(h).

We also conclude that the requisite findings for nullifying the order with respect to the '926 and '335 patents were made. In its August 10, 1981 order, the Commission stated that it had reviewed the "transcript of the decision [in the *Pontiac* case]" and "*determined . . . that . . . the exclusion order . . . should . . . operate only with respect to* [the '762 patent]." (Emphasis added.) The Commission thus necessarily found that the conditions leading to a determination to exclude imports on the basis of infringement of claims of the '926 and '335 patents "no longer exist".

■ Such a finding could properly be premised on the holding of the *Pontiac* case.

7. See n. 1, supra.

8. S–W does not assert that an exclusion order could not be terminated in part. Such a position would raise only a formalistic, not substantive, objection. By practice, the Commission issues exclusion orders covering several independent bases for exclusion of goods rather than separate exclusion orders for each. The multiple based approach was taken here in that goods infringing any *one* of the claims were excluded. Thus, in practical effect, the June 19

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Moreover, the law is well settled that the pendency of an appeal has no affect on the finality or binding effect of a trial court's holding. *Deposit Bank v. Frankfort,* 191 U.S. 499, 24 S.Ct. 154, 48 L.Ed. 276 (1903). *See also* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4433 (1981). That rule is applicable to holdings of patent invalidity as well. *Alamance Industries, Inc. v. Gold Medal Hosiery Co.,* 194 F.Supp. 538, 540, 129 USPQ 219, 220 (S.D.N.Y.1961). *See also,* H. Kaye, R. Lupo, and S. Lipman, *The Jurisdictional Paradigm Between the United States International Trade Commission and the Federal Courts,* 64 JPOS 118, 132–33 (1982).

The Commission took the action of modifying its exclusion order on its own motion. We agree that such action was appropriate, given the nature of a § 337 investigation, which results in an order operative against goods and which is equally effective against those who participate as those who do not participate in the proceeding. *Sealed Air Corp. v. USITC,* 645 F.2d 976, 985–86, 209 USPQ 469, 477–78 (CCPA 1981). The Commission cannot assume a passive role once an exclusion order is issued. As stated in *SSIH Equipment S.A. v. USTIC,* 673 F.2d 1387, 1390, 213 USPQ 529, 531 n. 8 (CCPA 1982):

> [T]he Commission's obligation [is] to be always concerned with the impact of its orders on the United States economy and consumers as well as its obligation to terminate orders.

In view of the foregoing, we conclude that the Commission acted properly in issuing its August 10, 1981 order,[8] and that

order may be thought of as separate orders on each claim, only two of which were not terminated on August 10. While the Commission's order of August 10, 1981, was phrased in terms of "suspension" of a portion of the earlier order, its effect was partial termination. We are not bound to consider it anything less because of the words used. *Cf. Rohm & Haas Co. v. USITC,* 554 F.2d 462, 463, 193 USPQ 693, 694 (CCPA 1977) (Commission order granting motion to dismiss without prejudice held with prejudice).

such action limited the appealable determination under § 337(d) to the validity of an exclusion order based solely on claims 10 and 12 of the '762 patent. SSIH, whose goods were specifically held to be barred by that order, is clearly adversely affected and may challenge the findings and conclusions on which it was based.

## III

█ Before addressing the merits of this appeal, it is necessary to clarify the standard of review.

The Commission, relying on § 337(c), as amended by the Customs Courts Act of 1980, Pub.L. No. 96–417, § 604, 94 Stat. 1727, 1744 (1980) (hereafter "Customs Courts Act"), and *General Motors Corp. v. USITC,* 687 F.2d 476, 215 USPQ 484 (CCPA 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983), contends that all of the Commission's factual findings are reviewable under the "substantial evidence standard." SSIH argues for review under the less stringent "clearly erroneous" standard which was previously applicable to appellate review of Commission decisions.[9]

Section 337(c), as amended, applies to "*civil actions* commenced on or after [November 1, 1980]", Pub.L. No. 96–417, § 701(b)(2), 94 Stat. 1747, 3209 (1980). SSIH asks us to interpret "civil action" to include a Commission investigation. Since the instant investigation began before No-

vember 1, 1980, under SSIH's view, the amendment does not affect this case.

█ Civil actions, as that term is commonly understood, refers to proceedings in court. It has been held, for example, that "a civil action is an adversary proceeding before a court of law; judicial review of a decision of an administrative agency is a civil action; a proceeding before the Commission is not a civil action." *Unnamed Physician v. Commission on Medical Discipline,* 285 Md. 1, 400 A.2d 396, 401 (1979). We believe "civil action" is intended to be so construed here and does not embrace the proceedings before the Commission. The burden of proof borne by SSIH during the investigation was not affected by the Customs Courts Act. We cannot accept that a party would not put forward its best case in anticipation of an easier road to reversal in the event it lost. Nor does SSIH assert that it had a right that a particular review standard be maintained. The question is merely one of statutory interpretation and the intent of Congress. From the language of the amendment we conclude that we are directed to apply the same standard of review to all appeals from Commission determinations after a certain date. Congress has chosen that date and we are not swayed from the conclusion that all appeals filed after November 1, 1980, are thus governed by § 337(c), as amended. *See, e.g., General Motors v. USITC, supra.* Accordingly, we will apply the substantial evidence test to factual findings on this appeal.[10] We are

---

The dissent's view that the *Pontiac* litigation could only be brought into the case as an affirmative defense of collateral estoppel by SSIH fails to appreciate that proceedings under § 337 are in the nature of investigations with only limited aspects of inter partes cases. Further, the issue of whether the Commission had to modify its order under *Blonder-Tongue Labs., Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), is reserved. We hold only that there was a justifiable basis for the modification here.

9. Standards of proof must be distinguished from standards of review. SSIH referred to "weight of the evidence" rather than "clearly erroneous" to identify the prior standard of review. However, as more fully explained in this writer's appended views, "weight of the evidence" is more appropriately used to identify a standard of proof at the trial level, and we

have, therefore, substituted "clearly erroneous" in its argument.

10. In *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966), the Supreme Court provided the following exposition of the "substantial evidence" test:

We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229 [59 S.Ct. 206, 217, 83 L.Ed. 126] [1938]. "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660] [1939] [footnote omitted].

not, of course, bound by the Commission's legal conclusions. *See* 5 U.S.C. § 706 (the reviewing court shall decide all relevant questions of law). *Accord, General Motors v. USITC, supra.*

## IV

### A.

The invention disclosed in the '762 patent is a system for displaying information and images, especially on stadium scoreboards. A large number of incandescent lamps ("display devices") are arranged in rows and columns to form a matrix. By activating different light bulbs to form patterns, information such as team names and scores and black-and-white stick-figures can be displayed. Claims 10 and 12, the claims in issue, are directed to successive displays of stick-figures to create an illusion of movement (animation).

The large scoreboard matrix is comprised of elements, each of which contains rows of light bulbs. An element displaying the letter "T" would appear thus: [11]

An element's relationship to the overall display can be illustrated thus:

A control unit determines the on-off state of the light bulbs in each element. A particular on-off state is maintained until that element is again "addressed," that is, the control unit selects that particular element for a change in its on-off pattern. Once addressed, all bulbs in the element turn off. If there is data in the control unit presented for another display in that element, the appropriate bulbs will turn on to form the prescribed pattern. Each of the elements in the scoreboard is controlled in the above manner. Thus, to simulate a cheerleader,

11. The representative displays shown throughout are really the reverse of the actual display. Where the bulb is off, it appears white in the drawings. Where the bulb is on, it appears black. The opposite effect is seen when the true display is viewed by the human eye.

for example, the appropriate elements would be addressed and provided the necessary data to result in the following (Picture A) on a portion of the scoreboard:

**Picture A**

To achieve the appearance of animated motion, the position of the legs and arms can be made to change so that the next picture (Picture B) would look like this:

**Picture B**

By alternating between Picture A and Picture B, the cheerleader appears to move. By increasing the number of pictures the animation can be made more complex.

Because each element can be addressed separately, the system is characterized as having a "random accessing" feature in its *preferred* mode of operation. As stated in the specification with regard to a series of pictures like the cheerleader examples above:

For example, the animated cheerleader ... may be displayed by programming each of the figures ... *in individual frames* one after the other in properly timed sequence. The indicator address and character display data for the complete first figure ... is programmed ... by using the proper codes for the individual indicator characters, spaces where indicators are blank and carriage returns for sequencing each row. A predeter-

mined interval *after the time* for [the first] figure ... data is programmed to cause the erasure of the figure in preparation for the display of [the next] figure.... A figure may be erased by addressing the necessary indicators followed by the data for a space .... The next figure ... is programmed for the *second frame,* again followed by blanking in preparation for the third figure ... for the complete cartoon.

*If desired the whole display need not be erased for each frame,* but rather only the desired indicators by individually addressing and actuating the desired indicators. Thus, if only the arms of the [first figure] are to move the appropriate indicators only are addressed and the remaining indicators will stay lit during the sequence. [Emphasis added.]

Thus, to go from Picture A, there are two options. The first (not random access) is to erase the entire display and to transmit the information necessary to display Picture B. The second is to transmit information only to those elements which are necessary to change from Picture A to Picture B. Whichever method is employed, the above-quoted description makes clear that all of the data necessary to display Picture A is contained in a "frame" for the entire picture, while whatever data necessary to change Picture A to Picture B is also contained in a "frame."

Such a "frame" refers to a "data frame" in a mass storage system, such as magnetic tape or paper tape. The specification discloses a mass storage system and one other temporary storage memory. The temporary storage memory is capable of storing no more data at one time than that associated with one element of the display matrix and acts as a buffer between the mass storage system and the display.

In the embodiment where the system does not function in a "random access" mode, the control system will automatically cycle through every element of the display and activate the lights necessary for a particular display and on the next cycle it can change the display. In this embodiment, the mass memory does not hold data for address purposes. The internal system automatically keeps track of what element is being altered. This embodiment is the type of display which turns off the entire picture and redisplays rather than changing only individual elements.

### B.

■ Because of certain statements by the Commission on the effect of the statutory presumption of validity (35 U.S.C. § 282[12]) in connection with claim 12, we will first address SSIH's contention that claim 12 is invalid.[13] SSIH argues that the invention claimed therein would have been obvious within the meaning of 35 U.S.C. § 103[14] in view of U.S. Patent No. 3,021,387 to Rajchman (Rajchman). There is no dispute that Rajchman is available as prior art, nor does

**12.** 35 U.S.C. § 282 provides in pertinent part:
A patent shall be presumed valid.... The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

**13.** Claim 12 reads:
A system for displaying an animated characterization made up of a sequence of visual display frames comprising a display board having display devices arranged in addressable locations, a memory for storing coded address and display data in data frames pertaining to a desired pattern for each of said visual display frames, means for reading the coded address and display data in said data frames from said memory in sequence, means responsive to the coded address data from said memory for preparing the ad-

dressed display devices and means responsive to the display data from said memory for actuating the addressed display devices to form the patterns of each frame.

**14.** 35 U.S.C. § 103 provides:
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

S–W dispute the Commission's view that Rajchman is more relevant than the art cited by the examiner during the prosecution of the '762 patent application.

The distinction between legal conclusions and factual findings with respect to evaluating assertions of obviousness was set forth in *General Motors v. United States,* 687 F.2d at 480, 215 USPQ at 487–88:

> In *Stevenson v. USITC,* 67 CCPA 109, 112, 612 F.2d 546, 549, 204 USPQ 276, 279 (1979), this court stated:
>
>> Obviousness is a legal conclusion based on factual evidence, *Graham v. John Deere Co.,* [383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)], . . . and not a factual determination.

The factual determinations from which to draw the conclusion of obviousness were set out by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

The Commission stated in adopting the recommended determinations of the ALJ:

> The Rajchman patent discloses a mural image reproducer for displaying television pictures utilizing a pair of storage circuits alternatively operated to supply video pulses to different rows of luminescent cells. There is more than an insubstantial difference between Rajchman and claim 12, however, in that Rajchman does not teach a memory for displaying data in data frames pertaining to a desired pattern. R.D. finding of fact 61. *The presumption of validity of claim 12 is thus weakened by the failure of the examiner to consider the most relevant prior art—the Rajchman patent—but it is not overcome.* Id. 59, 63. There are differences between claim 12 and Rajchman. Moreover, respondents adduced little or no evidence that claim 12 would have been obvious to one skilled in the art at

the time. Id. 62–63. In the absence of clear and convincing evidence of invalidity, doubt must be resolved in favor of the patentee. We therefore find claim 12 of the '762 patent valid.

213 USPQ at 480 (emphasis added).

■ Contrary to the Commission's statement, the presumption of validity was not altered by introduction of Rajchman, even though it was more relevant prior art. The presumption of validity afforded by 35 U.S.C. § 282 does not have independent evidentiary value. Rather the presumption places the burden of going forward, as well as the burden of persuasion, upon the party asserting invalidity. *Solder Removal Co. v. USITC,* 582 F.2d 628, 199 USPQ 129, 133 (CCPA 1978). We do not agree that the *presumption* is affected where prior art more relevant than that considered by the examiner is introduced. Rather the offering party is more likely to carry its burden of persuasion with such evidence. *Solder Removal Co. v. USITC,* 582 F.2d at 632–33, 199 USPQ at 133.

With respect to the Commission's statement that there must be "clear and convincing evidence *of invalidity*" (our emphasis), we find it inappropriate to speak in terms of a particular standard of proof being necessary to reach a legal conclusion. Standard of proof relates to specific factual questions. While undoubtedly certain facts in patent litigation must be proved by clear and convincing evidence, *Radio Corp. v. Radio Laboratories,* 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453 (1934), the formulation of a legal conclusion on validity from the established facts is a matter reserved for the court. As a reviewing court, this court must determine not only that the facts on which a judgment of validity or invalidity was based were satisfactorily established, but also whether those facts form an adequate predicate for the legal conclusion ultimately made.

With respect to claim 12 which SSIH asks us to hold invalid, there is no evidence of record on which to base that conclusion.

Claim 12 is directed to a scoreboard incorporating the random access feature capable of changing only a particular element. The limitation around which the parties concentrate their arguments pertains to the memory:

> a memory for storing *coded address* and display data in data frames pertaining to a desired pattern for each of said visual display frames .... [Emphasis added.]

During prosecution, the patentee amended claim 12 to specify that the data to be stored must be both address data to determine what part of the display is to be affected, i.e., the element, as well as the data which controls the pattern to be displayed for the entire picture or all parts to be changed. Moreover, the patentee specifically urged that storage of both address and display data was a basis for distinguishing over art cited by the examiner in originally rejecting claim 12. Thus, claim 12 is directed to a randomly accessible display system wherein the memory stores both the address data corresponding to the location of the element to be affected in a display and the data for what change must be made.

Rajchman discloses neither a memory capable of storing more than part of a total picture nor any manner of storing address data. Rajchman simply stores a part of a video signal in a memory whose contents are continually changed to correspond to the portion of the picture to be displayed. The operation of Rajchman is so rapid that an entire picture is viewed even though the whole picture is not stored at any one time. Further, the selection of which portion of the picture to display is automatic and is sequenced to correspond with the normal scanning operation of a television camera, for example. Address data is simply irrelevant in this context.

No prior art having been introduced to show both a memory capable of storing whole frames, nor anything whatsoever to suggest "random accessing" display devices, it has not been shown that the invention in claim 12 would have been obvious. Accord-

ingly, the Commission correctly refused to conclude that claim 12 is invalid.

## C.

[7] With respect to infringement, the question of "what is the thing patented" is one of law, while the question "has that thing been constructed [made], used or sold" by the alleged infringer is a factual issue, *Winans v. Denmead,* 56 U.S. (15 How.) 329, 337, 14 L.Ed. 717 (1853), to be proved by a preponderance of the evidence. *Decca Ltd. v. United States,* 544 F.2d 1070, 1081, 191 USPQ 439, 448 (Ct.Cl.1976). The Commission found that claim 12 was literally infringed by SSIH in the following terms:

> The SSIH invention nonetheless stores address data. Its memory constitutes a map of the display board, storing data at locations corresponding to the locations at which they are displayed. Thus, there is literal infringement of the '762 patent. We reject SSIH's file wrapper estoppel argument because we find literal infringement; infringement under the doctrine of equivalent [sic] is not at issue.

213 USPQ at 484. From a review of the entire record, we find this conclusion unsupported by substantial evidence. Not only has the Commission erroneously ignored the prosecution history of claim 12, which is always relevant to a proper interpretation of a claim, *see Astra-Sjuco A.B. v. USITC,* 629 F.2d 682, 686, 207 USPQ 1, 5 (CCPA 1980); *Autogiro Co. of America v. United States,* 384 F.2d 391, 395–99, 155 USPQ 697, 701–04 (Ct.Cl.1967), but also there is no evidence whatsoever to suggest that "coded address data" is actually stored in the SSIH system. As intimated by the Commission, and as testified to by all of the experts, such address storage is, at most, implicit. Since claim 12 explicitly requires coded address data storage, a conclusion of literal infringement must fail. Hence, the Commission erred in stating that the doctrine of equivalents need not be considered. Since infringement cannot be found in the absence of a finding of equivalence, we re-

verse the finding of infringement and remand for consideration of equivalence.[15]

### D.

■ The issue of the validity of claim 10 turns on whether the invention claimed therein [16] "was described" by the disclosure in U.S. Patent No. 3,384,888 to Harnden et al. (Harnden) within the meaning of 35 U.S.C. § 102(e).[17]

To be an anticipating reference, Harnden must disclose each and every element of the claimed invention. *Straussler v. United States,* 339 F.2d 670, 671, 143 USPQ 443, 443–44 (Ct.Cl.1964). *See also In re Arkley,* 455 F.2d 586, 172 USPQ 524 (CCPA 1972); *Eastern Rotorcraft Corp. v. United States,* 397 F.2d 978, 979, 154 USPQ 43, 44 (Ct.Cl. 1967). Thus, it was required that the Commission determine (1) what is the scope of the claim, i.e., what are all the elements of the claimed invention; and, (2) what does the reference disclose.[18]

The crucial question respecting claim 10, around which the arguments of the parties center, is whether the following limitation found in claim 10 refers to the temporary (one-element) storage within the device or the mass storage system:

a memory for storing multibit coded data in data frames pertaining to patterns for forming said animated characterizations
. . . .

From the analysis of the invention set forth in part IV, A, *supra,* it is manifest that the memory required by claim 10 is one that is capable of storing several frames at one time and, thus, refers to a mass storage system as opposed to the temporary memory. This appears to be the interpretation given by the Commission.

Harnden discloses a travelling message sign, but one which can be made to appear to be stationary and can be used for animation. Harnden states:

[T]he optical effect as viewed by an observer is that of a sudden presentation of a complete message which may occupy the entire length of the display sign . . . followed by another presentation of a complete message which may be identical to the first or changed therefrom in a predetermined manner.

Only one column of information can be fed into the Harnden display at a time. After the data for a column is fed into the sign, that data is "shifted" to the next column and new data is fed into the first column. To display animations, Harnden requires that Picture A be "shifted" into the display followed by shifting in Picture B. If the shifting is rapid enough, and all of the light bulbs are forced to remain in the off state while the data is being shifted

---

**15.** SSIH also urges that claim 12 is unenforceable because S–W's attorneys failed to cite the Harnden patent to the examiner during prosecution. As Harnden is more relevant art, as discussed *infra,* this issue should also have been addressed by the Commission.

**16.** Claim 10 reads:
 A system for displaying an animated characterization comprising a display board made up of a plurality of display devices, a memory for storing multibit coded data in data frames pertaining to patterns for forming said animated characterization, means for reading said data frames from said memory in sequence including electric signal conductor means having a sufficient number of conductors to transmit said multibit coded data but substantially less than the number of display devices making up said display board, and means in receipt of the data signals on said conductor means for operating said display devices in accordance with said sequenced data frames.

**17.** 35 U.S.C. § 102(e) provides, in pertinent part:
 A person shall be entitled to a patent unless—
 \* \* \* \* \* \*
 the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent
 . . . .
 S–W does not dispute that Harnden's filing date of December 30, 1974, is before the mid-1975 date asserted by S–W as the earliest date by which the invention claimed was first conceived and that Harnden is, thus, a valid reference.

**18.** The Recommended Determinations of the Administrative Law Judge (ALJ) and of the Commission are not clear or adequate. It is wholly insufficient to simply restate the language of the claims as findings.

in, the resultant display will be much like the claimed display.

Harnden also discloses a memory 42 in which several columns of information may be temporarily stored. The Commission found that this memory is not a "mass memory," but rather holds no more than the equivalent of data for one element in S–W's display.[19] While we do not question the correctness of this finding, we do not agree that it is dispositive.

The Commission (and the ALJ) wholly failed to take into account that Harnden also describes a mass storage system which utilizes, *inter alia,* magnetic tape or paper tape:

> The input information is supplied on a suitable recording medium and may include various types of coded tapes including printed, punched, or magnetic punched or printed cards, magnetic core storage, or film.

Since the limitation quoted from claim 10 requires only that the mass memory hold information necessary to display a series of several pictures (i.e., successive data frames), the conclusion is inescapable that Harnden's mass storage system also holds the data necessary for a series of several pictures to result in animation in the manner above described. Further, S–W does not argue that claim 10 does not otherwise read on Harnden's disclosure, nor do we think such an argument could be made. The major difference between the disclosures of Harnden and the '762 patent resides in the manner by which the information *is directed* to the elements of the display (random vs. non-random access). That difference, however, does not appear in

claim 10, and we cannot alter what the patentee has chosen to claim as his invention. *Autogiro Co. of America v. United States,* 384 F.2d at 396, 155 USPQ at 701, and cases cited at n. 5.[20]

Harnden's disclosure of a mass memory was totally ignored by the Commission. Since that memory is the only element said to be missing from the Harnden disclosure, the Commission's conclusion that claim 10 is valid is *reversed.*

## V

SSIH asserts that one or more of the other patents originally asserted by S–W were "procured through inequitable conduct" and that such activity also taints the '762 patent and renders it wholly unenforceable, citing *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245–47, 54 S.Ct. 146, 147–48, 78 L.Ed. 293 (1933).

The "inequitable conduct" is said to arise from a failure on the part of S–W to inform the patent examiner of certain acts alleged to constitute a possible on-sale bar under 35 U.S.C. § 102(b)[21] to all but the '762 patent. This inequitable conduct is not said to have occurred in connection with procurement of the '762 patent. Rather, SSIH relies solely on the supposition that all of the patents are so interrelated that S–W's "unclean hands" with respect to the later patents renders the '762 patent unenforceable. We reject this contention as a matter of law.

The acts which are alleged to have taken place all occurred after the '762 patent issued and do not deal with the invention claimed in the '762 patent. Moreover, the '762 patent issued almost three years

---

19. This memory is comparable to S–W's temporary memory.

20. The dissent urges that we resort to the specification to "add-in" random accessing as a limitation. Such an approach would be fruitless where, as here, the specification discloses both random and non-random accessing as different embodiments of the same invention. Even the precedent cited by the dissent does not espouse the view that a disclosed embodiment may be disregarded in claim interpretation.

21. 35 U.S.C. § 102(b) provides:

> A person shall be entitled to a patent unless—
> * * * * * *
> the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. . . .

before any of the other patents were applied for.

*Keystone Driller* and its progeny would deny enforcement of the '762 patent only if S–W were to have committed a fraud on the Commission itself. *See, e.g., Pfizer, Inc. v. International Rectifier Corp.,* 538 F.2d 180, 195, 190 USPQ 273, 286 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Such a situation does not exist here. Therefore, the enforceability of the '762 patent is unaffected.

## VI

The final issues raised by SSIH relate to injury to a domestic industry and the public interest.

The Commission's findings in those areas relied heavily on the '335 and '926 patents and the technology contained therein. The video patents, as the parties refer to them, were the primary focus of the Commission's inquiry. Such an inquiry is of no aid to us now where the only possible remaining basis for exclusion is the one claim (claim 12) which the SSIH and other competing scoreboards may not infringe, *see* n. 5, *supra.* Hence, upon remand the Commission is directed to reevaluate the public interest and injury factors.

### Conclusion

In view of the foregoing, the June 19, 1981 order as modified by the August 10, 1981 order is *vacated* and the case is *remanded* for further proceedings in accordance herewith.

REVERSED IN PART, VACATED, AND REMANDED.

KASHIWA, Circuit Judge, joins parts III, IVA, IVC, IVD, V and VI.

NIES, Judge.

These additional comments are added because this author perceives a recurring confusion, as in this case, between standards of proof at the trial level and standards of review at the appellate level with respect to the facts in the case.* The cases reviewed below indicate the importance of recognizing the distinction which must be made between trial and appellate standards and in understanding what is meant by each standard.

The importance of the distinction is well illustrated by the opinion in *Charlton v. Federal Trade Commission,* 543 F.2d 903 (D.C.Cir.1976), in which the FTC attempted to rely upon "substantial evidence" to *determine* facts. In reversing the FTC's decision, the court provided the following analysis:

> We perceive one error which, all else aside, necessitates administrative reconsideration of the evidence. The crux of the difficulty is the Commission's use of a totally incorrect standard of proof in passing on Charlton's blameworthiness.
>
> \* \* \* \* \* \*
>
> It was in the definition of that burden—in the degree of proof required—that the Commission faltered grievously. Its decision on disciplinary action was, in its words, to "be based on substantial evidence of record." "Substantial evidence," the Commission said, was not "the 'preponderance' of the evidence"; but "something less than the weight of the evidence"; it was, the Commission declared, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." In adopting that formulation as the criterion by which Charlton's conduct was to be gauged, the Commission hopelessly confused two legal canons designed to serve entirely distinct purposes.
>
> To be sure, on judicial review of agency action, administrative findings of fact must be sustained when supported by substantial evidence on the record considered as a whole. But that rule implicates only the reviewing court; the yardstick by which the agency itself is to initially ascertain the facts is something else again. We need not pause to elabo-

---

\* I do not at this time enter the debate as to what is a fact but, rather, start with the proposition that a factual issue, not a legal issue, is before the court.

rate on the differing norms for treatment of the evidence in administrative and reviewing tribunals, respectively.[30] It suffices for present purposes simply to recall that in American law a preponderance of the evidence is rock bottom at the factfinding level of civil litigation.[31] Nowhere in our jurisprudence have we discerned acceptance of a standard of proof tolerating "something less than the weight of the evidence."

[30] See generally 4 K. Davis, Administrative Law §§ 29.01–29.11 (1958).

[31] See, e.g., the numerous cases collected in 9 J. Wigmore, Evidence, § 2498 at 325–326 n. 1 (3d ed. 1940), Supp.1975 at 118–119 n. 1. Sometimes the standard is expressed in somewhat varying phraseology, but the meaning remains substantially equivalent. Id. § 2498 at 325–327.

Id. at 906–07 (footnotes 24–29 and 32 omitted).

In *Woodby v. INS,* 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966), the Court similarly reversed because of the misapplication of an appellate standard to the trial level.

I

*Standards of Proof of Facts at the Trial Level*

A particular quantum or burden of proof at the trial level (standard of proof) is generally a judge-made requirement shaped in accordance with considerations of due process and/or the importance of certain facts. *Herman & MacLean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). As explicated in *Addington v. Texas,* 441 U.S. 418, 423–25, 99 S.Ct. 1804, 1808–09, 60 L.Ed.2d 323 (1979), three levels of proof are generally recognized: preponderance (or weight) of the evidence, clear and convincing proof, and beyond a reasonable doubt. The analysis is as follows:

The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *In re Winship,* 397

U.S. 358, 370 [90 S.Ct. 1068, 1075, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decisions.

Generally speaking, the evolution of this area of the law has produced across a continuum three standards or levels of proof for different types of cases. At one end of the spectrum is the typical civil case involving a monetary dispute between private parties. Since society has a minimal concern with the outcome of such private suits, plaintiff's burden of proof is a mere preponderance of the evidence. The litigants thus share the risk of error in roughly equal fashion.

In a criminal case, on the other hand, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. *In re Winship, supra.*

The intermediate standard, which usually employs some combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly used, but nonetheless "is no stranger to the civil law." *Woodby v. INS,* 385 U.S. 276, 285 [87 S.Ct. 483, 487, 17 L.Ed.2d 362] (1966). See also C. McCormick, Evidence § 320 (1954); 9 J. Wigmore, Evidence § 2498 (3d ed. 1940). One typical use of the standard is in civil cases involving allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's

burden of proof. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. *See, e.g., Woodby v. INS, supra,* at 285 [87 S.Ct. at 487] (deportation); *Chaunt v. United States,* 364 U.S. 350, 353 [81 S.Ct. 147, 149, 5 L.Ed.2d 120] (1960) (denaturalization); *Schneiderman v. United States,* 320 U.S. 118, 125, 159 [63 S.Ct. 1333, 1336, 1353, 87 L.Ed. 1796] (1943) (denaturalization).

\* \* \* \* \* \*

We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence. Nonetheless, even if the particular standard-of-proof catchwords do not always make a great difference in a particular case, adopting a "standard of proof is more than an empty semantic exercise." *Tippett v. Maryland,* 436 F.2d 1153, 1166 (CA4 1971) (Sobeloff, J., concurring in part and dissenting in part), cert. dismissed *sub nom. Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972). [Footnote omitted.]

## II

### Standards of Review of Facts by Appellate Court

The standards of appellate review of factual determinations, in contrast to the quantum of proof required at the trial level, are usually statutorily imposed. The standards most commonly specified are "*de novo,*" "clearly erroneous," "supported by substantial evidence" and "arbitrary or capricious," which I translate roughly into questions of increasingly narrow focus: is a finding of fact right; is it wrong; it is unreasonable; is it irrational?

A "*de novo*" standard provides the widest latitude for review of facts. The court in "*de novo*" review must exercise its independent judgment on the evidence of record and weight it as a trial court. The court is not, however, required to ignore the decision below. *See Nulf v. International Paper Co.,* 656 F.2d 553, 563 (10th Cir.1981), and cases cited. *United States v. First City National Bank,* 386 U.S. 361, 368–69, 87 S.Ct. 1088, 1093–94, 18 L.Ed.2d 151 (S.D. Tex.1966) provides the following guidance:

> [T]he 1966 Act provides that the court in an antitrust action "shall review *de novo* the issues presented." (Emphasis added.) 12 U.S.C. § 1828(c)(7)(A). It is argued that the use of the word "review" rather than "trial" indicates a more limited scope to judicial action. The words "review" and "trial" might conceivably be used interchangeably. The critical words seem to us to be "*de novo*" and "issues presented." They mean to us that the court should make an independent determination of the issues. Congressman Patman, the Chairman of the House Committee that drafted the Act, in speaking of this *de novo* review, said that the court would "completely and on its own make a determination as to whether the challenged bank merger should be approved under the standard set forth in paragraph 5(B) of the bill." He added that the "court is not to give any special weight to the determination of the bank supervisory agency on this issue."

\* \* \* \* \* \*

The courts may find the Comptroller's reasons persuasive or well nigh conclusive. But it is the court's judgment, not the Comptroller's, that finally determines whether the merger is legal.

With respect to "clearly erroneous," the next level in the hierarchy, this standard is defined in *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948):

> A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

The standard commonly associated with review by an appellate court of agency

determinations is "supported by substantial evidence." This standard (perhaps because of its inept name) appears to be the least comprehended. To begin, a "substantial evidence" standard restricts an appellate court to a greater degree than "clearly erroneous" review. The Supreme Court, in *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), undertook to set out the development and various interpretations which had been given to "substantial evidence" as a standard of review.

Beginning with its previously defined standard:

> "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126]. Accordingly, it "must do more than create a suspicion of the existence of the fact to be established . . . . it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660.

*Id.* 340 U.S. at 477, 71 S.Ct. at 459, the Court noted that some courts had interpreted the standard to require a myopic view of the record, stating:

> [U]nder a "prevalent" interpretation of the "substantial evidence" rule "if what is called 'substantial evidence' is found anywhere in the record to support conclusions of fact, the courts are said to be obliged to sustain the decision without reference to how heavily the countervailing evidence may preponderate—unless indeed the stage of arbitrary decision is reached. Under this interpretation, the courts need to read only one side of the case and, if they find any evidence there, the administrative action is to be sustained and the record to the contrary is to be ignored."

*Id.* at 481, 71 S.Ct. at 460 (footnote omitted). The Court unequivocally rejected this interpretation:

> The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment.

> To be sure, the requirement for canvassing "the whole record" in order to ascertain substantiality does not furnish a calculus of value by which reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.* Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

*Id.* at 488, 71 S.Ct. at 464.

The Court's ultimate conclusion was as follows (*Id.* at 490, 71 S.Ct. at 465):

> We conclude, therefore, that the Administrative Procedure Act and the Taft-Hartley Act direct that courts must now assume more responsibility for the rea-

sonableness and fairness of Labor Board decisions than some courts have shown in the past. Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that the Board keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.

The narrowest latitude to a reviewing court is where the court can reverse a decision only by finding it "arbitrary or capricious." *Citizens to Protect Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is the seminal case discussing this standard. Suffice for purposes here to say that the standard is

> whether the decision was based on the relevant factors and whether there has been a clear error of judgment.

*Id.* at 416, 91 S.Ct. at 823.

### III

### *Interrelationship of Trial and Appellate Standards*

 While the standard of review and the standard of proof are distinct concepts, nevertheless, the degree of proof below affects the appellate decision whether to affirm or reverse, regardless of what standard of review is applicable. For example, in reviewing whether the evidence supports a finding of fact on a "clearly erroneous" standard, the decision might be affirmed if the standard of proof below were "weight

of evidence" and might be reversed on the same record if the standard of proof were "clear and convincing" evidence. Thus, the appellate court must first focus on what support is needed for the trial court determination and then review, in accordance with the standard of review permitted in the type of case, whether that finding is properly supported. For example, in applying the substantial evidence standard of review (i.e., the reasonableness of the lower decision), the appellate court in *Whitney v. SEC,* 604 F.2d 676, 681 (D.C.Cir.1979), correctly, in my view, stated its function to be: "We review the Commission's findings only to ascertain whether ... there is evidence which a reasonable person might find clear and convincing."

EDWARD S. SMITH, Circuit Judge, concurring in part and dissenting in part.

I concur in the decision to remand the case to the U.S. International Trade Commission (Commission), but I respectfully decline to join certain portions of the majority opinion, as set forth below.

I concur in the result reached by the majority that only the '762 patent is before the court in this appeal in that the '926 and '335 patents are not appealable by SSIH at this time. I also agree that claim 12 of the '762 patent is valid, although I feel that the majority unduly limits the scope of claim 12. I respectfully dissent, however, from the majority's conclusion that claim 10 of the '762 patent is invalid. I feel that the court has failed to consider an important question of claim interpretation posed by several precedents of the U.S. Court of Claims.

### I.

I agree that the issue of the collateral estoppel effect, if any, of the district court judgment of invalidity in the *Pontiac* case should be reserved. Collateral estoppel is an affirmative defense[1] and for that and other reasons simply is not an issue in this case. The Commission could, and apparent-

1. *Blonder-Tongue Laboratories, Inc. v. University of Ill. Found.,* 402 U.S. 313, 350, 91 S.Ct.

1434, 1453, 28 L.Ed.2d 788, 169 USPQ 513, 527 (1971); Fed.R.Civ.P. 8(c).

ly did, consider the uncertainty generated by the *Pontiac* judgment in crafting its remedial order.

## II.

### THE '762 PATENT

With respect to the validity of claim 12 of the '762 patent, I concur in the result reached by the majority. I am unable, however, to join the majority's conclusion that claim 10 is anticipated by Harnden under 35 U.S.C. § 102(e) (1976). My review of claim 10 has revealed a potential problem of claim interpretation with respect to the precedents of the former U.S. Court of Claims, binding on this court under *South Corp. v. United States*,[2] which compels me to dissent.

### A.

I agree with the majority that claim 12 is valid. The majority's reasoning, however, appears unnecessarily to limit the scope of that claim. The reference Rajchman lacks a memory system as is called for in claim 12 and is, instead, supplied with input data through a photoelectric scanning circuit rather than from a memory. That difference alone is sufficient to ground the conclusion of validity over the reference. Yet, the majority proceeds to read into claim 12 the additional limitation of randomly accessing the display. While claim 12 clearly provides a system *capable* of random access display operation, the invention set forth in claim 12 is not so limited. Claim 12 merely provides a system by which the display *could* be randomly accessed. It is not limited to that mode of operation, but rather, fully in accordance with the limitations of claim 12, an entire subsequent data frame could be read onto the display in a non-random access mode of operation. This departure might be critically importance under the doctrine of equivalents on remand.

Nonetheless, I agree with the majority that claim 12 is not literally infringed, as the SSIH system does not store address data in the form required by the claim—

multibit coded address data. While a finding of equivalence is implicit in the Commission's decision, the Commission did not undertake the requisite analysis. Thus, the case must be remanded for consideration of whether SSIH's hardwired mode of address data storage infringes claim 12 under the doctrine of equivalents.

### B.

Claim 10 poses a potential problem of claim interpretation. The parties and the majority focus primarily on the memory limitation of claim 10, and I agree that that element is taught by the reference. The critical limitations of claim 10, however, would appear to be those relating to the sequence of processing and displaying the data.

The standard test of anticipation is whether the claim reads on the reference—an "infringement" test. The "majority rule" heretofore has been that the language of the claim defines the metes and bounds of the invention for purposes of determining its validity. A minority of courts have, however, referred to the specification to provide additional limitations to the claim in order to save the claim from invalidity. The court in the instant case appears to analyze the invention as defined exclusively by the limitations of claim 10, without reference to any additional limitations of the specification. It is clear that under such an approach, claim 10 is invalid.

Claim 10 is quite broad. The reference expressly discloses the key element of contention between the parties—the memory element. Additionally, the limitations on the manner of operation and on the sequencing and display of the data are so general and so broad as to read on the reference. If recourse is made to the specification, however, it is clear that the invention and reference do *not* function in substantially the same manner, belying the conclusion that they describe the same invention within the meaning of 35 U.S.C. § 102(e).

---

**2.** *South Corp. v. United States,* 690 F.2d 1368, 1370, 215 USPQ 657, 658 (Fed.Cir.1982).

The court's approach is, however, supported by a substantial body of precedent. A majority of courts have declined to go beyond the language of the claim to the specification in order to save the claim from invalidity.[3] The court today follows that "majority" approach without recognition of several binding precedents of the Court of Claims, which precedents appear to compel a different result.

The Court of Claims has generally embraced the "minority" approach to claim interpretation. That court has read the claim in conjunction with the specification in order to preserve the validity of a claim.[4] Such "minority" approach garners at least some degree of support from Supreme Court precedent on the construction of an ambiguous claim.[5] The articulation of the "minority" rule by the Court of Claims, however, goes beyond the situation where the claim is ambiguous.

In *Decca Ltd. v. United States,* the Court of Claims, affirming per curiam a recommended decision by then Commissioner Lane (later a judge of the Court of Customs and Patent Appeals), clearly articulated its approach in relying on the specification to supply additional limitations not found in the claims: [6]

> Defendant contends that claims 1, 2, and 3 of the '980 patent are invalid under Title 35 U.S.C. § 102 or § 103. In support of its contentions, defendant relies

on prior art patents and a report disclosing a navigation system known as LF Loran which was developed subsequent to the Loran-A system. * * *

> We must note initially that claims 1, 2, and 3 of the '980 patent are so broad, by themselves, as to encompass *any* device accomplishing the general operation they describe. In fact, the claims would read precisely on an apparatus consisting of an LF Loran, with its master and slave stations, transmitting pulse-modulated signals, coupled to the British O'Brien patent, employing a phase discriminator-phase regulator. Since these are clearly "old", and plaintiff insists it has produced something novel, it is evident that a more detailed description is necessary to enable a reader to distinguish the '980 from other devices which might be covered by the '980 claims if they are read broadly and literally. [Emphasis in original.]

> *To prevent such invalidity* of the patent for overbreadth and clear anticipation (35 U.S.C. § 112 (1964); *Hailes v. Van Wormer,* 20 Wall. 353, 372, 22 L.Ed. 241 (1873); *see also Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 336 U.S. 271, 276–277 [69 S.Ct. 535, 538–39, 93 L.Ed. 672 [80 USPQ 451, 453] (1949); *Special Equipment Co. v. Coe,* 324 U.S. 370, 385–386 [65 S.Ct. 741, 748, 89 L.Ed. 1006] [64 USPQ 525, 532] (1945) (dissent); *General*

3. *See, e.g., Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 586 F.2d 917, 199 USPQ 641 (2d Cir.1978), *cert. denied,* 440 U.S. 961, 99 S.Ct. 1503, 59 L.Ed.2d 774, 201 USPQ 960 (1979); *Philips Indus., Inc. v. State Stove & Mfg. Co.,* 522 F.2d 1137, 186 USPQ 458 (6th Cir.1975); *Wilcox Mfg. Co. v. Eastern Gas & Fuel Assocs.,* 400 F.2d 960, 158 USPQ 510 (4th Cir.1968), *cert. denied,* 393 U.S. 1051, 89 S.Ct. 691, 21 L.Ed.2d 693, 160 USPQ 832 (1969); *Beatty Safway Scaffold Co. v. Up-Right, Inc.,* 306 F.2d 626, 134 USPQ 379 (9th Cir.1962).

4. *Roberts Dairy Co. v. United States,* 182 USPQ 218, 223–24 (Ct.Cl.1974), *aff'd,* 208 Ct.Cl. 830, 530 F.2d 1342, 198 USPQ 383 (Ct.Cl.1976); *Decca Ltd. v. United States,* 190 Ct.Cl. 454, 420 F.2d 1010, 1021, 164 USPQ 348, 357 (Ct.Cl. 1970), *cert. denied,* 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104, 167 USPQ 321 (1970); *Palmer v. United States,* 191 Ct.Cl. 346, 423 F.2d 316, 320–21, 163 USPQ 250, 254 (Ct.Cl.1969), *aff'd,*

423 F.2d 316, 165 USPQ 88 (Ct.Cl.1970), *cert. denied,* 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 258, 167 USPQ 705 (1970). *See also Dominion Magnesium Ltd. v. United States,* 162 Ct.Cl. 240, 320 F.2d 388, 394, 138 USPQ 306, 310 (Ct.Cl.1963); *Leesona Corp. v. United States,* 185 USPQ 156, 164 (Ct.Cl.1975), *aff'd,* 208 Ct.Cl. 871, 530 F.2d 896, 192 USPQ 672 (Ct.Cl. 1976). *But see Chesterfield v. United States,* 141 Ct.Cl. 838, 159 F.Supp. 371, 116 USPQ 445 (Ct.Cl.1958).

5. *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966) ("it is fundamental that claims are to be construed in the light of the specification and both are to be read with a view to ascertaining the invention").

6. *Decca Ltd. v. United States,* 420 F.2d at 1021, 164 USPQ at 357.

Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 368–372 [58 S.Ct. 899, 901–903, 82 L.Ed. 1402] [37 USPQ 466, 468–70] (1938)), *the specifications must in this instance be read to limit the claims. Hailes v. Van Wormer,* 20 Wall. 353, 372, 22 L.Ed. 241 (1873); *Dominion Magnesium Ltd. v. United States,* 320 F.2d 388, 394 [138 USPQ 306, 310–11] (1963). The painstaking detail of plaintiff's description indicates that the specifications reveal, not a mere example of his invention, but rather the precise nature of the claimed discovery. Thus, plaintiff's claim must be limited to what appears in the description. *Hailes v. Van Wormer, supra,* 20 Wall. at 372 [22 L.Ed. 241] * * *. * * * [Emphasis supplied.]

Again in *Roberts Dairy v. United States,*[7] the court referred to the specification to provide additional limitations to the claim and thus, preserve its validity:

In *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917), the Supreme Court stated that "The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification." More recently, the Supreme Court reiterated that position in *United States v. Adams,* 383 U.S. 39, 49 [86 S.Ct. 708, 713, 15 L.Ed.2d 572] [148 USPQ 479, 482] (1966), when it stated: "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." *See also, Tate Engineering, Inc. v. United States,* [193 Ct.Cl. 1088] 477 F.2d 1336, 1340 [178 USPQ 365] (1973). Thus, a patentee is bound by his specification in interpreting his patent claims even when his specification requires a narrower interpretation of the claims than the patentee desires. *Texsteam Corp. v. Blanchard,* 352 F.2d 983, 147 USPQ 431 (5th Cir.1965), *cert. denied,* 387

U.S. 936 [87 S.Ct. 2064, 18 L.Ed.2d 1000] [153 USPQ 888] (1967).

* * * * * *

Furthermore, *this construction* of claim 1 *is required to* distinguish it, as will be more fully discussed hereinafter, from the prior art and to thus *avoid invalidity. Calico Scallop Corp. v. Willis Bros., Inc.,* 458 F.2d 390, 173 USPQ 321 (4th Cir. 1972); *Tate Engineering, Inc. v. United States, supra.* [Emphasis supplied.]

It is clear that there is adequate Court of Claims precedent to support reference to the specification in order to save a claim.

These two analytic approaches (majority and minority) would reach different results on the facts of the instant case. As in *Decca,* despite the breadth of the language of claim 10 standing alone, the specification provides adequate description of the invention to safely conclude that the reference and the invention operate in a substantially different manner and thus reflect different inventions.

The specification discloses an extremely flexible control system for a data display device. Data is stored in "frames" corresponding to the visual display frames. The system is capable of randomly accessing both the memory and the display, although neither claim 10 nor the specification is limited to that mode of operation of either display or memory. The flexibility of the control system enables data to be processed from memory into the display in the sequence that it is displayed. In contrast, the sequencing of data processing and display disclosed by Harnden is far less flexible.

Harnden's logic transfer circuits consist exclusively of serially connected shift registers. This structure is physically incapable of the flexibility of data transfer that is the key feature of the invention embodied in the '762 patent. The shift register logic can transfer data only sequentially from one register to the next consecutive register. Harnden does, however, disclose an anima-

---

7. *Roberts Dairy Co. v. United States,* 182 USPQ at 223–24, *aff'd,* 530 F.2d at 1352, 198 USPQ 383.

tion technique involving the presentation of a data set, flushing that data through the registers, and presentation of the next data set. Harnden processes the data as follows:

The traveling message sign hereinabove described may also be utilized as a changing sign, that is, a sign wherein the characters do not move thereacross but are fixed in position and can be changed. Examples of the latter type of sign are * * * and various *scoreboards* associated with sporting events such as baseball and horse racing. The message is encoded on the tape and goes through the same process in information circuit 24 and is thence transferred to the display sign, however, the lamp intensity control 26 is controlled in synchronism with the transfer of the message from information circuit 24 to the remote display sign such that all of the lamps on the sign are maintained in a dark condition during the interval of message transfer. Upon the complete message being obtained on the sign, decoder-encoder 41 instructs speed switch 50 in clock circuit 25 to switch to the stop position, thereby stopping the movement of characters on the display sign, and lamp intensity control 26 is simultaneously controlled to obtain the desired brilliance of lamp intensity on the sign. Thus, the optical effect as viewed by an observer is that of a sudden presentation of a complete message which may occupy the entire length of the display sign, then a short time interval of no message, followed by another presentation of a complete message which may be identical to the first or changed therefrom in a predetermined manner. [Emphasis supplied.]

To illustrate, assume a display of five registers and data flow from left to right through consecutive registers, as shown in figure 1.

388

FIGURE 1

OPERATION OF THE HARNDEN DEVICE
LOGIC AND DISPLAY SEQUENCING

* When the desired data is centered in the array, the "clock" is stopped and
the display is illuminated for the desired length of time.

The data processing logic of the invention of the '762 patent, on the other hand, is not so limited. The control system of the invention can produce a display of "T" followed immediately by "I" either by changing the entire array or by deleting only the horizontal arms of the "T." The operation can be performed either with or without randomly accessing the memory as well as the display. It is not necessary to process the additional unneeded data through a series of registers, as does Harnden. The specification clearly establishes the mode of operation of the invention and that mode is significantly different from the mode of operation of Harnden. Construed in view of the specification, claim 10 is *not* anticipated by Harnden under 35 U.S.C. § 102(e).

In order to establish the validity of claim 10, it has been necessary to limit the literal language of the claim by reference to the specification. Thus, it would be unfair to grant Stewart-Warner the full breadth of the broad language of the claim for purposes of infringement. I would hold claim 10 valid and remand the case to the Commission for reconsideration of the issue of infringement with specific direction to consider the effect of the reverse doctrine of equivalents on the Commission's finding of infringement.

### III.

I dissent because the principles of claim interpretation set out in *Decca* and *Roberts Dairy* would produce a result different from that reached by the majority. There are persuasive policy arguments for limiting the definition of the invention to the language of the claims when considering the issue of validity. Such an approach has considerable logical power. It reduces the subjectivity of validity analysis, resulting in increased consistency and predictability. Admittedly, the determination of validity, as opposed to infringement, should not vary based on the equities of any particular case. Yet, that may be the result where equity is allowed to step into the specification and supply additional limitations to the claims. The better rule may well be to force the patentee to bear the burden of invalidity resulting from the overbreadth of a claim.

There is a significant body of precedent, however, which accommodates the more subjective "minority" approach to claim interpretation and the former Court of Claims is one of those courts that has articulated that more subjective approach. Rather than allow the issue to slip silently into the backwaters of the law, I write to ventilate the issue of claim interpretation raised by these precedents. The court does not address this issue today. Despite the problems inherent in a subjective approach, provided that the claim is given a consistent interpretation in any particular case, a fair and consistent result can be achieved. The analysis may be more subjective than under the "metes and bounds" approach; however, as the precedents of this court grow in number, the uniformity and predictability sought by the Federal Courts Improvement Act of 1982 may yet obtain because of the court's exclusive jurisdiction over patent appeals. The "metes and bounds" rule may ensure even greater uniformity and predictability. The court's failure to reject, or even to grapple with, the "minority" rule in this case, however, leaves two sets of rules governing claim interpretation in the body of precedent of the Federal Circuit—a situation far more damaging to predictability than the consistent application of the more subjective rule.

KASHIWA, Circuit Judge, joins in Parts I and II.A of this dissent, but not in Parts II.B and III.