899 F.2d 1204
 12 ITRD 1145, 14 U.S.P.Q.2d 1396
 HYUNDAI ELECTRONICS INDUSTRIES CO., LTD., Appellant,
v.
UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee.
Intel Corporation and SEEQ Technology, Inc., Intervenors-Appellees
 No. 89-1600.
 United States Court of Appeals,
Federal Circuit.
 April 4, 1990.
 
 Stephen B. Judlowe, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, argued for appellant. With him on the brief were Marvin N. Gordon and Charles Quinn.
 Judith M. Czako, Office of the General Counsel, U.S. Intern. Trade Com'n, Washington, D.C., argued for appellee. With her on the brief were Lyn M. Schlitt, General Counsel and James A. Toupin, Asst. General Counsel. John D. Norris, Arnold, White & Durkee, Houston, Tex., argued for appellee. With him on the brief were James J. Elacqua and Hilary E. Pearson. Also on the brief was Carl Silverman, Intel Corp., Santa Clara, Cal., of counsel. James W. Geriak and Thomas J. Morgan, Lyon & Lyon, Los Angeles, Cal. entered appearances.
 Before ARCHER and MAYER, Circuit Judges, and COWEN, Senior Circuit Judge.
 OPINION
 MAYER, Circuit Judge.
 
 
 1
 Hyundai Electronics Industries Co., Ltd. (Hyundai) appeals from the decision and exclusion order of the United States International Trade Commission (Commission) (1) prohibiting Hyundai from importing to the United States erasable programmable read only memories (EPROMs) that the Commission determined to infringe one or more United States patents, and (2) requiring Hyundai to certify, as a condition of entry, that certain of its secondary products which require EPROMs to function do not contain the infringing EPROMs. Certain Erasable Programmable Read Only Memories, Components Thereof, Products Containing Such Memories, And Processes For Making Such Memories, Inv. No. 337-TA-276, USITC Pub. No. 2196 (Mar. 16, 1989) (EPROM Order). We affirm.
 
 Background
 
 2
 This appeal and three others presently before the court[1] stem from an investigation instituted by the Commission on September 16, 1987, in response to a complaint filed by Intel Corporation (Intel) of Santa Clara, California. The complaint alleged that Hyundai and six other named respondents had engaged in unfair trade practices in violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. Sec. 1337 (1982 & Supp. II 1984), by either manufacturing EPROMs according to a process covered by, or selling and importing EPROMs that themselves infringed, one or more Intel patents.[2] As required under the version of section 337 then in force, Intel also alleged that the effect or tendency of the unfair methods of competition and unfair acts was to destroy or substantially injure an industry in the United States that was efficiently and economically operated. See 19 U.S.C. Sec. 1337(a) (1982).
 
 
 3
 On August 4, 1988, after the parties had completed discovery and for nine and one-half weeks presented evidence to the presiding administrative law judge, the Senate passed a bill (previously approved by the House of Representatives) amending section 337 to eliminate the complainant's burden of proving domestic economic injury. Anticipating that the President would endorse Congress' action, the administrative law judge decided to admit at the hearing on the economic issues, scheduled to begin August 8, 1988, only evidence pertinent under the amended section 337.
 
 
 4
 Eleven days after completion of the trial on the economic issues, the President signed the Omnibus Trade and Competitiveness Act of 1988. Pub.L. No. 100-418, 102 Stat. 1107 (Aug. 23, 1988) (OTCA). Section 1342 of the OTCA amended the relevant portions of section 337 to provide:
 
 
 5
 Sec. 1337. Unfair Practices in import trade
 
 
 6
 (a) Unlawful activities; covered industries; definitions
 
 
 7
 (1) Subject to paragraph (2), the following are unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provision of law, as provided in this section:
 
 
 8
 * * * * * *
 
 
 9
 (B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that(i) infringe a valid and enforceable United States patent ...; or (ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.
 
 
 10
 * * * * * *
 
 
 11
 (2) Subparagraph[ ] (B) ... of paragraph (1) appl[ies] only if an industry in the United States, relating to the articles protected by the patent ... concerned, exists or is in the process of being established.
 
 
 12
 * * * * * *
 
 
 13
 19 U.S.C.A. Sec. 1337(a) (West Supp.1989).
 
 
 14
 Shortly after the President signed the OTCA, the Commission issued interim rules implementing the act and stated in their preamble that it would apply the amended section 337 to all pending investigations. Interim Rules Governing Investigations and Enforcement Procedures Pertaining to Unfair Practices in Import Trade, 53 Fed.Reg. 33,043, at 33,044 (1988). Consequently, the administrative law judge granted Intel's September 16, 1988, motion to amend its complaint and the notice of investigation by deleting allegations that the domestic EPROM industry was efficiently and economically operated as well as injured by the respondents' allegedly infringing activities. The Commission denied Hyundai's petitions for review of both the administrative law judge's decisions limiting the scope of the hearing on the economic issues and allowing Intel's September 16 motion, and the Commission's decision to apply the amended section 337 to the pending EPROM investigation.
 
 
 15
 Hyundai is a Korean corporation that manufactures a wide array of electrical products, including integrated circuits, computers and related equipment, telecommunications equipment, and electronic automotive parts. It became embroiled in the EPROM investigation, however, not by engaging in these activities but by performing under a manufacturing agreement with another respondent, General Instrument Corporation (General Instrument). As amended, the agreement obligates Hyundai to serve as a "foundry" for EPROMs manufactured according to the mask sets and process flows, and with the technical assistance, of General Instrument. In exchange, General Instrument agrees to purchase at a guaranteed price certain minimum quantities of three types of EPROMs. The agreement also allows Hyundai, upon payment of a royalty, to use EPROMs manufactured in excess of General Instrument's requirements for its own purposes. Hyundai hoped, by exploiting this provision, to procure EPROMs for its own products more cheaply than by purchasing them from third parties like Fujitsu, its primary supplier and an Intel licensee.
 
 
 16
 Hyundai commenced production of EPROMs for General Instrument in late 1986. The latter routinely took possession of the EPROMs at the Seoul, Korea, airport, shipped them to Taiwan for further processing, and subsequently imported some portion of them to the United States. To date, Hyundai has not fully satisfied General Instrument's EPROM requirements; as a consequence, it has neither used in its own products nor imported in any form into the United States any of the accused EPROMs.
 
 
 17
 Nevertheless, based upon the administrative law judge's findings that the EPROMs Hyundai produced pursuant to its agreement with General Instrument infringed one or more of four valid and enforceable Intel patents--findings that Hyundai does not challenge--the Commission issued an order "exclud[ing] from entry into the United States for the remaining terms of the patents, except under license of the patent owner or as provided by law," EPROMs "manufactured abroad by Hyundai ... pursuant to designs and process technology provided to it by General Instrument ..., whether assembled or unassembled, ... incorporated into a carrier of any form, ... [or] assembled onto circuit boards of any configuration." EPROM Order at 6. The order also excluded from entry Hyundai computers, computer peripherals, telecommunications equipment, and automotive electronic equipment containing infringing EPROMs. Id. Moreover, because these same "downstream" or "secondary" products are generally of a type that require EPROMs, and because Hyundai has the right under its manufacturing agreement with General Instrument to use excess EPROMs for its own requirements, the Commission included in its order a certification provision:
 
 
 18
 Pursuant to procedures to be specified by the U.S. Customs Service, as the Customs Service deems necessary, persons seeking to import computers, computer peripherals, telecommunications equipment, or automotive electronic equipment manufactured by Hyundai ..., carriers of any form, and/or circuit boards of any configuration, containing EPROMs, shall, prior to the entry or at entry summary of such products into the United States, certify that they have made appropriate inquiry and thereupon state that to the best of their knowledge and belief any EPROMs incorporated into, assembled onto, or contained in such products are not covered by this Order.
 
 
 19
 Id. at 8.
 
 
 20
 The Commission recognized that there was no evidence either of the number and type of EPROMs contained in the Hyundai products Intel sought to have excluded, or that Hyundai had in the past exploited or intended in the future to avail itself of the terms of the manufacturing agreement allowing it to use excess General Instrument EPROMs for its own requirements. Id. at 126. Nevertheless, the Commission reasoned that, in light of the 1988 amendments to section 337 eliminating proof of injury to a domestic industry as an element of a complainant's case, it would be inappropriate to require a showing that specific Hyundai downstream products caused injury to the domestic EPROM industry before including them within the scope of an exclusion order. Id. at 123. Upon balancing Intel's interest in receiving protection from all infringing imports against the risk of disrupting trade in legitimate products, the Commission concluded that this certification provision embodied a reasonable compromise.
 
 Discussion
 
 21
 Hyundai has conceded one of the two issues it originally noticed on appeal: that the Commission illegally applied the amended version of section 337 to the pending EPROM investigation. The remaining issue is whether the Commission properly included Hyundai secondary products within the scope of its limited exclusion order.
 
 A.
 
 22
 The parties differ on the threshold issue of what standard of review we apply to Commission remedy determinations. Citing Fischer & Porter Co. v. United States Int'l Trade Comm'n, 831 F.2d 1574, 1580 (Fed.Cir.1987), and 5 U.S.C. Sec. 706(2)(E) (1982), Hyundai contends that we must set aside Commission remedy determinations that are unsupported by substantial evidence. The government, on the other hand, asserts that in light of the language and legislative history of section 337, as well as our precedent, the appropriate standard is whether the Commission's choice of remedy is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See id. Sec. 706(2)(A).
 
 
 23
 The government is correct. Section 337(c) provides:
 
 
 24
 The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section.... Each determination under subsection (d) [exclusion of articles from entry] or (e) [exclusion of articles from entry during investigation except under bond] of this section shall be made on the record after notice and opportunity for a hearing in conformity with the provisions of [5 U.S.C. Secs. 551-59]. All legal and equitable defenses may be presented in all cases. Any person adversely affected by a final determination of the Commission under subsection (d), (e), (f), or (g) of this section may appeal such determination, within 60 days after the determination becomes final, to the United States Court of Appeals for the Federal Circuit for review in accordance with [5 U.S.C. Secs. 701-06]. Notwithstanding the foregoing provisions of this subsection Commission determinations under subsections (d), (e), (f) and (g) of this section with respect to its findings on the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, the amount and nature of bond, or the appropriate remedy shall be reviewable in accordance with [5 U.S.C. Sec. 706 ].
 
 
 25
 19 U.S.C.A. Sec. 1337(c) (West Supp.1989) (emphasis added).
 
 
 26
 Congress clumsily though adequately expressed in this provision a desire to subject Commission determinations on the public interest, the nature of the domestic market, bonding, and remedy, to a less stringent standard of judicial review than determinations of substantive violations of section 337. Some confusion arises because Congress specified that 5 U.S.C. Sec. 706[3] applies both to the class of determinations that includes the remedy and to determinations under subsections (d) and (e) to exclude goods from entry.
 
 
 27
 The conflict is only apparent. Section 706(2)(E) makes the substantial evidence standard applicable to agency findings and conclusions in only two instances: "in a case subject to sections 556 and 557" of Title 5 or in a case "otherwise reviewed on the record of an agency hearing provided by statute." There are, in turn, only two instances in which a case is subject to sections 556 and 557: "when rules are required by statute to be made on the record after opportunity for an agency hearing," 5 U.S.C. Sec. 553(c), and "in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing," id. Sec. 554(a). See id. Secs. 556(a), 557(a); see also Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 414, 91 S.Ct. 814, 822-23, 28 L.Ed.2d 136 (1971). Therefore, we apply the substantial evidence standard of review only to Commission factual findings underlying determinations to exclude goods from entry under subsections 337(d) and (e), because subsection (c) requires that only those determinations "be made on the record after notice and opportunity for a hearing...." We have consistently recognized and applied this principle. See, e.g., Corning Glass Works v. United States Int'l Trade Comm'n, 799 F.2d 1559, 1565 (Fed.Cir.1986); American Hosp. Supply Corp. v. Travenol Laboratories, Inc., 745 F.2d 1, 6 (Fed.Cir.1984); SSIH Equip. S.A. v. United States Int'l Trade Comm'n, 718 F.2d 365, 371 & n. 10 (Fed.Cir.1983).
 
 
 28
 Of the five other standards of review articulated in 5 U.S.C. Sec. 706(2), only the arbitrary, capricious, abuse of discretion standard contained in subsection (A) is relevant here. Hence Commission findings on the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, United States consumers, the amount and nature of bond, and the appropriate remedy--all are reviewable only for abuse of administrative discretion.
 
 
 29
 Again, we have previously recognized this principle. In Viscofan, S.A. v. United States Int'l Trade Comm'n, 787 F.2d 544, 548 (Fed.Cir.1986), we said that "the Commission has broad discretion in selecting the form, scope, and extent of the remedy, and judicial review of its choice of remedy necessarily is limited." We expressly applied to the remedy determinations of the International Trade Commission the same standard of review applied to like determinations of the Federal Trade Commission: "the courts will not interfere except where the remedy selected has no reasonable relation to the unlawful practices found to exist." Id. (quoting Jacob Siegel Co. v. Federal Trade Comm'n, 327 U.S. 608, 613, 66 S.Ct. 758, 760-61, 90 L.Ed. 888 (1946)).
 
 
 30
 We view the "no reasonable relation" language of Viscofan as equivalent to the arbitrary, capricious, abuse of discretion standard mandated by section 337(c) for Commission remedy determinations. The touchstone of both is rationality: if the Commission has considered the relevant factors and not made a clear error of judgment, we affirm its choice of remedy. Citizens to Preserve Overton Park, 401 U.S. at 416, 91 S.Ct. at 823-24.
 
 B.
 
 31
 The Commission's remedy determination in this case readily meets this standard. It represents a careful and common-sense balancing of the parties' conflicting interests as well as other relevant factors and is solidly based on the evidence of record.
 
 
 32
 In performing this balancing, the Commission may consider such matters as the value of the infringing articles compared to the value of the downstream products in which they are incorporated, the identity of the manufacturer of the downstream products (i.e., are the downstream products manufactured by the party found to have committed the unfair act, or by third parties), the incremental value to complainant of the exclusion of downstream products, the incremental detriment to respondents of such exclusion, the burdens imposed on third parties resulting from exclusion of downstream products, the availability of alternative downstream products which do not contain the infringing articles, the likelihood that imported downstream products actually contain the infringing articles and are thereby subject to exclusion, the opportunity for evasion of an exclusion order which does not include downstream products, the enforceability of an order by Customs, etc. This list is not exclusive; the Commission may identify and take into account any other factors which it believes bear on the question of whether to extend remedial exclusion to downstream products, and if so to what specific products.
 
 
 33
 EPROM Order at 125.
 
 
 34
 The Commission's limited exclusion order requiring Hyundai to certify, as a condition of entry, that certain of its downstream products do not contain infringing EPROMs is a reasonable accommodation of these factors. The Commission found that Hyundai had violated section 337; that specific EPROM chips embodied the violation; that Hyundai remained free under its manufacturing agreement with General Instrument to use excess infringing EPROMs for its own requirements; and that Hyundai could easily assemble the infringing EPROMs into and import them as part of other Hyundai product "containers" that require EPROMs to function, including wafers, circuit boards, computers, computer peripherals, telecommunications equipment, and automotive electronic equipment. It concluded that the certification provision "is a reasonable means of ensuring the effectiveness of the remedy to which Intel has proven itself entitled." Id. at 127. We agree.
 
 
 35
 The Commission fashioned the remedy with sensitivity and objectivity. It declined to include Hyundai automobiles within the scope of the certification provision because to do so "would not significantly increase the relief afforded complainant." Id. at 128. It did not extend the exclusion order to Hyundai EPROMs not manufactured under the General Instrument agreement because they either were not subject to the investigation or were covered by an earlier consent order entered by the Commission. Id. at 129. And it refused to issue Hyundai a cease and desist order, see 19 U.S.C.A. Sec. 1337(f), (g), because there was no evidence that Hyundai maintained significant inventories of infringing articles in the United States. Id. at 130.
 
 
 36
 Hyundai's challenge strikes us as a thinly veiled and vaguely expressed dissatisfaction with the certification procedure it expects the Customs Service to devise when it implements the Commission's order. But that procedure is not before us and cannot be contested in a proceeding seeking review of the Commission's underlying remedy determination. The Commission's decision in this case to enter a limited exclusion order containing a certification provision is both reasonable and well within its authority. Indeed, we have recognized, and Hyundai does not dispute, that in an appropriate case the Commission can impose a general exclusion order that binds parties and non-parties alike and effectively shifts to would-be importers of potentially infringing articles, as a condition of entry, the burden of establishing noninfringement. See, e.g., SSIH Equip., 718 F.2d at 370.
 
 
 37
 The rationale underlying the issuance of general exclusion orders--placing the risk of unfairness associated with a prophylactic order upon potential importers rather than American manufacturers that, vis-a-vis at least some foreign manufacturers and importers, have demonstrated their entitlement to protection from unfair trade practices--applies here with increased force. Hyundai has not challenged the Commission's determination that it violated section 337 by manufacturing EPROMS that infringe valid and enforceable Intel patents. Given this and the other findings, we cannot say that the Commission abused its discretion by concluding that Hyundai rather than Intel should bear whatever additional burden the certification provision entails.
 
 Conclusion
 
 38
 The decision and order of the International Trade Commission is affirmed.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 The other cases are General Instrument Corp. and Microchip Technology Inc. v. United States Int'l Trade Comm'n, No. 89-1534 (Fed.Cir. filed Jun. 19, 1989); Atmel Corp. v. United States Int'l Trade Comm'n, No. 89-1476 (Fed.Cir. filed May 30, 1989); and Intel Corp. v. United States Int'l Trade Comm'n, No. 89-1459 (Fed.Cir. filed May 17, 1989). The issues presented by Hyundai are entirely distinct from those raised by the appellants in these cases
 
 
 [2]
 For the curious or technically inclined,
 An erasable programmable read only memory (EPROM) is a monolithic integrated circuit containing thousands of metal oxide semiconductor (MOS) transistor cells on which encoded binary information can be stored. The transistor cells in an EPROM are arranged in arrays of rows and columns, permitting individual access to each cell. In addition to the transistor (memory) cells, an EPROM has various other electronic elements, which operate as sensing devices, operating circuits, buffers, etc. EPROMs are used to store programs for various computer operations. EPROMs can be programmed, then erased by the application of ultraviolet radiation and reprogrammed, as the needs of the user dictate.
 EPROM Order at 12 (footnotes omitted).
 
 
 [3]
 Section 706 provides:
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 (B) contrary to constitutional right, power, privilege, or immunity;
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 (D) without observance of procedure required by law;
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.